Michael C. OWENS, Appellant,

v.

STATE of Indiana, Appellee.

No. 69S00–9212–CR–1045.

Supreme Court of Indiana.

Dec. 14, 1995.

Rehearing Denied April 10, 1996.

Eugene C. Hollander, Special Assistant, to State Public Defender, Indianapolis, for Appellant.

Pamela Carter, Attorney General, Lisa M. Paunicka, Louis E. Ransdell, Deputy Attorney General, Indianapolis, for Appellee.

SULLIVAN, Justice.

On June 14, 1992, a jury convicted Michael C. Owens in Ripley Circuit Court on six of seven counts with which he had been charged: Battery, a Class C felony (Count II);[1] four counts of Intimidation as Class D felonies (Counts III, IV, VI, and VII);[2] and Murder (Count V).[3] The jury acquitted Owens of Criminal Confinement (Count I).[4]

The trial court imposed a sentence of one and a half years on each of the four intimidation counts and enhanced the sentence on each count by one and a half years for aggravating circumstances. It imposed a sentence of four years on the battery count and enhanced that sentence by four years for aggravating circumstances. The trial court imposed the presumptive sentence of forty years on the murder count and enhanced that sentence by twenty years for aggravating circumstances. The trial court finally ordered that all the sentences imposed be served consecutively for a total sentence of eighty years.

We have jurisdiction over this direct appeal because the longest single term imposed was greater than fifty years. Ind. Const. art. 7, § 4; Ind.Appellate Rule 4(A)(7); *Wiseman v. State* (1988), Ind., 521 N.E.2d 942, 943.

*Facts*

The facts in the record most favorable to sustaining the verdicts are that on the Fri-

day evening of June 21, 1991, Michael Owens and Brian Horan had been drinking vodka, playing cards, and throwing horseshoes at the house of Owens's brother Rodney. At about 11 p.m., both Owens brothers and Horan went for a drive in Rodney's Thunderbird. While the three were driving around, they saw Gary Bennett, Jr. and Bob Hendricks riding bicycles. Horan, who was driving, stopped the car, and there followed a conversation between those in the car and the bicyclists. Michael Owens and Horan got into a brief argument with Bennett about Bennett's having slept with both Horan's and Rodney's wives. After the argument had subsided, Bennett and Hendricks, who had also been drinking, got into the car to go riding and drinking with the other three men. With Horan still at the wheel, they drove around for a while, stopping at various places, including a bar where Bennett bought a bottle of rum that he shared with the others.

Eventually the expedition took the men to a secluded area known as Devil's Elbow. Horan parked the car, and all of the men got out of the car to talk and drink. At some point, Horan told Bennett he knew that Bennett had been "messing around with my old lady," and then Horan began to hit Bennett, who did not respond in kind. They fought until Horan knocked Bennett to the ground, at which point Michael Owens also jumped on Bennett and began punching and kicking Bennett, saying, "You've been fucking my sister-in-law."

Owens punched Bennett a few times and kicked him six to eight times in the head, chest, groin, and stomach. While he was kicking Bennett in the groin, Owens said, "You'll never use this again." When Owens stopped kicking Bennett, Horan kicked him another six or eight times. Bennett began apologizing and pleading for the beating to stop, at which point both Owens and Horan began to beat him again. When Bennett tried to stand up, Owens and Horan taunted him and beat him some more.

---

1. Ind.Code § 35–42–2–1 (West Supp.1992).

2. Ind.Code §§ 35–45–2–1(a)(1) & (b)(1) (1993).

3. Ind.Code § 35–42–1–1 (1993).

4. Ind.Code § 35–42–3–3 (1993).

Owens and Horan dragged Bennett to the car and slammed his head against the car. Bennett collapsed. Owens and Horan picked him up and slammed his head against the car again. This happened a total of six to eight times.

Neither Rodney Owens nor Hendricks struck Bennett. Both tried to intervene in the beating, but Michael Owens told them to stay out of it or be beaten themselves.

The Owens brothers, Horan, and Hendricks eventually got back in the car and drove off, leaving Bennett at Devil's Elbow. As they drove away, Bennett crawled to a fencepost and shouted at the departing car, "It ain't over, you guys are going to get yours."

The four men in the car drove back to Rodney Owens's house; Michael Owens and Horan took showers to wash off the blood from the beating and changed clothes. Owens and Horan then borrowed Rodney's Thunderbird, and with Hendricks riding in the back seat, they returned to Devil's Elbow. On the way, Owens warned Hendricks not to tell anyone of what he had seen.

When they arrived back at Devil's Elbow, they found Bennett leaning against a fence. Horan said that he could not "believe the son-of-a bitch was still up," got out of the car, went over to Bennett, grabbed him, knocked him to the ground, and began to beat Bennett yet again. When Horan stopped, Owens ran over to Bennett, who was lying on the ground, and began punching and kicking him. This second beating lasted about ten minutes.

Owens and Horan had a brief discussion, after which Owens approached Hendricks to tell him that Horan wanted to kill him because Hendricks had been a witness to the beating. After Owens and Horan had had another discussion, Owens told Hendricks that they had decided not to kill him, but while driving Hendricks home, Owens threatened Hendricks and his family if Hendricks should tell anyone what he had seen.

At about 3:30 a.m., the Thunderbird stalled across the street from where Horan's brother-in-law, Bobby Huntington, was staying. Owens and Horan got a jump start from one of Huntington's neighbors; Huntington asked for a ride into town. Instead of driving Huntington into town, Owens drove back to Devil's Elbow. On the way, Owens said that he intended to beat Bennett some more if he was still alive, and that he was afraid Hendricks might talk so they might have to kill him.

Gary Bennett was dead when they arrived; the men discussed ways to dispose of the body, including whether to dump it over a hill or to sink it in a quarry. After about twenty minutes, with the body in the Thunderbird's trunk, the men drove off. Eventually Huntington got out of the car, called his girlfriend, and then went directly to the police to tell them what he had seen.

Later that morning, the police found Gary Bennett's charred body in the Thunderbird's trunk; they also found a charred human bone on the burn pile behind Horan's mother's house. The police identified the burned body as Bennett's through dental records. The autopsy of the body showed that the cause of Bennett's death was severe trauma to the head inflicted before his body was burned.

We shall provide additional facts as necessary.

Owens raises a number of issues on appeal. We restate those issues as:

1. Whether the trial court should have dismissed three counts of the charging information after a grand jury failed to hand down an indictment on the death penalty?

2. Whether there was insufficient evidence to support Owens's conviction for Murder?

3. Whether there was insufficient evidence to support Owens's convictions for Intimidation?

4. Whether the trial court abused its discretion when it denied Owens's motion for a change of venue of venire panel or when it *sua sponte* dismissed a juror for cause?

5. Whether it was reversible error for the trial court to permit a police officer to testify about what one of the witnesses had told him?

6. Whether the trial court should have granted Owens's motion to suppress evidence gathered from the search of an automobile?

7. Whether Owens's convictions and sentences for Battery and Murder subjected him to double jeopardy?

I

Owens first argues that because a grand jury returned a "no bill" on the question of whether the State should seek the death penalty, the trial court should have dismissed the confinement, battery, and murder counts against him. In the alternative, because the grand jury proceedings were conducted in secret, and because the prosecutor only provided the trial court with a partial transcript of the proceedings, Owens requests that we remand this case so he may present the issue to the trial court on a complete record of the grand jury proceedings.

In October, 1991, after charging Owens with Murder by information in July, the prosecutor presented to a grand jury the issue of whether to seek the death penalty in this case. The prosecutor charged the grand jury as follows:

This is October, 11, 1991, the grand jury previously impaneled is sitting and we are prepared to charge them, the question before the grand jury is should Brian C. Horan, strike that, Brian E. Horan, I believe it is, and Michael Owens be charged under Indiana Code 35–50–2–9, providing for the death sentence, as a result of their actions with respect to the murder, strike that, with respect to the death of Gary Bennett, Jr....

Appendix to Br. of Appellant Brian Horan at 79–80. After deliberating, the grand jury, speaking through its foreman, said, "It is the unanimous decision of the jury that we don't have enough evidence to ask for the death penalty." Appendix to Br. of Appellant Brian Horan at 80.

Because the grand jury failed to indict on the death penalty, Owens moved to dismiss the confinement, battery, and murder charges. The trial court denied the motion.

▪ Owens argues that because the death penalty statute, like the habitual offender statute,[5] merely serves to enhance a sentence for an underlying charge and is not a charge itself, even if the grand jury only considered whether the death penalty should be requested, the "no bill" it returned "also applied to the underlying murder charge as well as the related charges of Confinement and Battery since the death penalty is only viable if attached to the Murder charge." (Br. of Appellant at 42).

Indiana Code § 35–34–1–1 (1993)[6] provided in part that "[a]ll prosecutions of crimes shall be instituted by the filing of an information or indictment...." Indiana Code § 35–34–1–2 (1993)[7] governed the contents of an indictment or information and provided in part:

(a) The indictment or information shall be in writing and allege the commission of *an offense* by:

. . . .

(2) stating the name of *the offense* in the words of the statute or any other words conveying the same meaning;

(3) citing the statutory provision alleged to have been violated ...;

(4) setting forth the nature and elements of *the offense* charged ...;

. . . .

(Emphases added). Indiana Code § 35–34–2–12(a) (1993) provides: "Before the grand jury proceeds to deliberate on whether to issue an indictment, the prosecuting attorney shall, on the record: (1) identify each target of the grand jury proceeding; and (2) identify *each offense* that each target is alleged to have committed." (Emphasis added). Indiana Code § 35–34–1–6(a) (1993) provides in part: "An indictment or information is

---

5. The version of the habitual offender statute in effect at the time of Owens's trial was Ind.Code Ann. § 35–50–2–8 (West Supp.1990). In 1993 and 1994, the legislature substantially amended the statute. *See now* Ind.Code Ann. § 35–50–2–8 (West Supp.1994).

6. *See now* Ind.Code Ann. § 35–34–1–1 (West Supp.1994).

7. *See now* Ind.Code Ann. § 35–34–1–2 (West Supp.1994).

**472**

defective when: .... (3) the grand jury proceeded to deliberate on whether to issue an indictment, and voted not to indict the defendant for *the offense* identified on the record under Indiana Code 35–34–2–12(a)." (Emphasis added). Indiana Code § 35–34–1–6(c) (1993) provides: "Except as provided in section 5 of this chapter, an indictment or information or a count thereof *shall* be dismissed upon motion when it is defective." (Emphasis added).

The issue Owens raises is apparently one of first impression in Indiana. What is clear from the statutes above is that the State may only seek an indictment for an "offense." Indiana Code § 35–41–1–19 (1993) provides: " 'Offense' means a crime. The term does not include an infraction." Without deciding the question, we express here our doubt that the State has the authority to seek an indictment for a "violation" of Indiana Code § 35–50–2–9, our death penalty statute, since we have already said in another context that our death penalty statute is analogous to our habitual offender statute, Indiana Code Ann. § 35–50–2–8 (West Supp.1994), and merely provides for enhancement of a sentence. *See Games v. State* (1989), Ind., 535 N.E.2d 530, 535, *cert denied*, 493 U.S. 874, 110 S.Ct. 205, 107 L.Ed.2d 158. Since we do not decide this issue, we also do not decide what the effect would have been had the State sought the death penalty after the grand jury had returned a no bill on whether to seek the death penalty.

■ But the State did not seek the death penalty in this case, and the issue is not presented of whether the State could seek the sentence enhancement provided for by Indiana Code § 35–50–2–9 after the grand jury had failed to indict. We see no reason that the State should have been estopped or otherwise precluded from continuing its prosecution of Owens for what are undoubtedly "offenses."

Because the record of the grand jury proceedings that the State provided is incomplete, Owens also asks us to remand so that the trial court may consider his motions to dismiss on a full record of those proceedings. Owens only argues that the record is incomplete; he does not argue that any issue was put to the grand jury other than whether the State should seek the death penalty. We therefore see no need to remand to the trial court for reconsideration of Owens's motion to dismiss.

## II

Owens raises two arguments that evidence was insufficient to support his conviction for Murder. First, he argues, the evidence showed that he was so drunk the evening of the killing that he could not have formed the *mens rea* required to support a murder conviction. Second, Owens claims, the most that can be inferred from his actions is that he intended to beat Bennett.

### A

■ Evidence of voluntary intoxication is always admissible on the issue of *mens rea*. *Fowler v. State* (1988), Ind., 526 N.E.2d 1181, 1182. When a defendant offers evidence that he was voluntarily intoxicated, he raises the issue of whether the drugs or alcohol he consumed rendered him incapable of forming the required criminal intent without rendering him incapable of performing the acts required to commit the crime. *Johnson v. State* (1992), Ind., 584 N.E.2d 1092, 1099, *cert denied*, 506 U.S. 853, 113 S.Ct. 155, 121 L.Ed.2d 105 (1992). In *Terry v. State* (1984), Ind., 465 N.E.2d 1085, Justice Givan wrote for the court: "Any factor which serves as a denial of the existence of *mens rea* must be considered by a trier of fact before a guilty finding is entered. Historically, facts such as age, mental condition, mistake or intoxication have been offered to negate the capacity to formulate intent." *Id.* at 1088; *see also Melendez v. State* (1987), Ind., 511 N.E.2d 454, 456–57.

■ Whether a defendant was so intoxicated that he could not have had the *mens rea* required to commit the crime charged is a question for the trier of fact. *Tata v. State* (1986), Ind., 486 N.E.2d 1025, 1027. We will affirm a conviction so long as there is substantial evidence of probative value from which a trier of fact could conclude beyond a reasonable doubt that a defendant could form the requisite *mens rea* to commit the crime.

Evidence that shows a defendant was not so intoxicated so that he could indeed form the requisite *mens rea* includes such things as his ability "to devise a plan, operate equipment, instruct the behavior of others, or carry out acts requiring physical skill." *Terry,* 465 N.E.2d at 1088.

■ In this case, there was certainly substantial evidence that Owens had had a great deal to drink before he participated in the fatal beating of Bennett. But there was also evidence that Owens drove a car, was aware enough of what he was doing and had done to threaten Rodney Owens, Robert Huntington, and Robert Hendricks, and that he, with Horan, devised a plan to dispose of Bennett's body. From this evidence, the jury could have reasonably concluded beyond a reasonable doubt that Owens knowingly killed Bennett.

■ Similarly, from the severity of the beating and the threats issued against the various witnesses, the jury could have concluded beyond a reasonable doubt that Owens knowingly killed Bennett and did not just intend to beat him.

### B

■ Although Owens does not raise the issue, we note that the trial court orally instructed the jury on the murder charge as follows: "To convict either defendant, the State must have proved each of the following elements: the defendant one, knowingly; two, killed; three, Gary Bennett Jr." It also instructed the jury on voluntary intoxication in the following language: "Voluntary intoxication is a defense to the crimes of criminal confinement, battery, intimidation, and murder. Voluntary intoxication is a defense only to the extent that it negates an element of an offense referred to by the phrase 'with intent to' or 'with an intention to.'"

Although the first sentence of the instruction on voluntary intoxication clearly states that voluntary intoxication is a "defense" to the crime of murder, the second sentence of the instruction quotes verbatim the language of Indiana Code § 35–41–3–5(b) (1993). In *Terry,* we declared this statute void and without effect because voluntary intoxication may be offered on the issue of *mens rea* on *any* criminal charge. 465 N.E.2d at 1088. It was error to instruct the jury in this case that voluntary intoxication is a defense only for crimes that use the phrases "with intent to" or "with intention to," especially in view of the State's charge that Owens *knowingly* killed Bennett. Despite the trial court's specific statement that voluntary intoxication is a defense to Murder, the jury could reasonably have inferred that the evidence presented of voluntary intoxication did not apply either to the *mens rea* element of the murder charge or to the *mens rea* elements of the lesser included offenses of Murder on which the trial court instructed the jury.

But we find the error in this case to have been harmless. The State charged Owens with four counts of Intimidation. Two charged instances of intimidation occurred when Owens threatened his brother Rodney and Hendricks to stay out of the first beating or be beaten themselves. A second charged instance occurred after the second beating when Owens threatened to kill Hendricks if Hendricks told anyone about what he had seen.

Indiana Code § 35–45–2–1(a) (1993) defines Intimidation in part as follows: "A person who communicates a threat to another person, *with intent that:* (1) the other person engage in conduct against his will ... commits intimidation...." (Emphasis added). The jury convicted Owens of all counts of Intimidation with which he had been charged. Even when it considered the evidence of intoxication in relation to the charged *intentional* crimes, as the trial court had instructed it to do, the jury convicted Owens of those crimes. It is, then, clear the jury did not think Owens had been so intoxicated that he could not *intend* his actions. Because the commission of those intentional crimes was interlaced with the beatings that resulted in Bennett's death, it follows that Owens was not so intoxicated at the time that he could not *know* that he was killing Bennett. To put it differently, the jury found the fact beyond a reasonable doubt that Owens was sober enough to commit Intimidation, an intentional crime. It follows that Owens, at the same times that he was sober

enough to intimidate, was sober enough to knowingly kill Bennett.

We raise the issue because although the error was harmless in this case, it is unlikely to be so in another. Indiana Code § 35–41–3–5(b) should be repealed.

### III

Owens argues both that the evidence was insufficient to support his convictions on four counts of Intimidation and that the convictions and sentences on multiple counts of intimidation subjected him to double jeopardy.

### A

When reviewing a claim that the evidence presented at trial was insufficient to support a conviction, we neither weigh evidence nor judge the credibility of witnesses. We consider only the evidence supporting the conviction and the reasonable inferences to be drawn from that evidence. *Vance v. State* (1994), Ind., 640 N.E.2d 51, 57. We will affirm a conviction if there was substantial evidence of probative value from which a rational trier of fact could have concluded beyond a reasonable doubt that the defendant was guilty. *Id.* (citing *Woods v. State* (1980), 274 Ind. 624, 629, 413 N.E.2d 572, 577).

Indiana Code § 35–45–2–1 defines the crime of Intimidation and provides in part:

(a) A person who communicates a threat to another person, with the intent that:

(1) the other person engage in conduct against his will; or

. . . .

commits intimidation, a Class A misdemeanor.

(b) However, the offense is a:

(1) Class D felony if:

(A) the threat is to commit a forcible felony; or

. . . .

(c) "Threat" means an expression, by words or action, of an intention to:

(1) Unlawfully injure the person threatened. . . .

. . . .

Indiana Code § 35–41–1–11 (1993) defines "forcible felony" as "a felony that involves the use or threat of force against a human being, or in which there is imminent danger of bodily injury to a human being."

With respect to Count III of the information, which charged as Class D felony that Michael Owens intimidated Rodney Owens, the evidence supporting the conviction showed that when Rodney Owens tried to intervene during the first beating of Bennett, Michael Owens told him to stay out of it or be beaten himself. With respect to Count IV of the information, which charged as a Class D felony that Owens intimated Hendricks, the evidence showed that Owens similarly threatened Hendricks to stay out of the first beating or be beaten himself. With respect to Count VI of the information, which charged as a Class D felony that Owens intimated Hendricks again, the evidence showed that Owens threatened Hendricks with death shortly after the second beating were Hendricks to tell anyone of what he had seen. With respect to Count VII of the information, which charged as a Class D felony that Owens intimidated Robert Huntington, the evidence showed that in Huntington's presence Owens said that he would kill anyone who "squealed" on him.

Owens's argument on appeal that the threats against Rodney Owens, Hendricks, and Huntington were neither serious nor taken seriously cannot avail. First, whether a defendant intended that someone engage in conduct against his or her will depends on the facts and circumstances of each case. *Hyde v. State* (1988), Ind., 531 N.E.2d 472, 473. Second, we have adopted an objective view of whether a communication is a threat. *Id.* Therefore, both whether Owens intended that the three men engage in conduct against their will and whether his communications to the three men, objectively viewed, were threats were questions of fact for the jury to decide.

There was substantial evidence of probative value on each element of each alleged instance of intimidation; the jury convicted Owens on all four counts of Intimi-

dation. There is no basis for us to disturb those verdicts.

## B

■ Owens argues that we should set aside all but one of his four convictions for Intimidation. He argues that because the alleged acts of intimidation occurred as part of the same continuous conduct, the convictions and sentences on all four counts of Intimidation subjected him to double jeopardy. As authority for his argument, Owens refers us to our decisions in *Beno v. State* (1991), Ind., 581 N.E.2d 922, *Watkins v. State* (1991), Ind., 575 N.E.2d 624, and *Bowling v. State* (1990), Ind., 560 N.E.2d 658.

First, exercising our constitutional power to review and revise sentences, Ind. Const. art. 7, § 4, in *Beno* we found unreasonable consecutive *sentences* for four, virtually identical crimes, the commission of which was invited by a police sting operation. *Beno* in no way intimated that the convictions and *some* sentence on each of those convictions were inappropriate. In fact, because the threats uttered by Owens involved different people at different times, *Beno* supports the State's contention that convictions and sentences on all four counts of Intimidation did not violate any principle of double jeopardy.

*Watkins* and *Bowling* both involved multiple alleged crimes *simultaneously* committed against a *single* victim, and are therefore factually distinguishable from this case. Here, on one occasion Owens threatened two people: Rodney Owens and Hendricks. On another occasion he threatened Hendricks again—and in terms much more dire than on the first occasion. On yet a third occasion he threatened Huntington. Owens committed four distinct acts of intimidation against three victims and was not subjected to double jeopardy by being convicted and sentenced for each separate act.

## IV

Owens argues that the trial court should have granted his motion for a change of venue of venire panel and that the trial court committed reversible error when it *sua sponte* dismissed a juror for cause.

## A

■ Before trial, Owens moved for a change of venue from Ripley County. Owens based his motion on the extensive pretrial publicity his prosecution had received in the county. After a hearing, the trial court denied the motion but decided to draw the jury venire panel from Jefferson County. Owens objected because Jefferson County had recently had a celebrated murder case of its own, and now contends on appeal that the jury drawn from Jefferson County could not be impartial because of the publicity surrounding the Jefferson County case.

■ We review a trial court's decision to change the venue of a venire panel for an abuse of discretion. *Bradley v. State* (1995), Ind., 649 N.E.2d 100, 108. In order to demonstrate that a trial court abused its discretion, a defendant must show both "prejudicial pretrial publicity and juror inability to render an impartial decision." *Schweitzer v. State* (1989), Ind., 531 N.E.2d 1386, 1389; *see also Timmons v. State* (1986), Ind., 500 N.E.2d 1212, 1217.

First, Owens has not shown that the pretrial publicity of the Jefferson County case was prejudicial. While the facts of that case may have been grisly and even gruesome, that is the end of the alleged similarity in the cases. Second, Owens does not point to a single juror who was familiar with *his* case. In light of Indiana Code § 35-37-1-5 (1993), which provides that even a juror who is familiar with the case at issue may not be excused for cause if the prospective juror states that he can judge the case solely on the evidence adduced at trial, we cannot say that the trial court abused its discretion in denying Owens's motion when not a single juror was familiar with Owens's case.

## B

■ During voir dire, the trial court joined in examining one of the prospective jurors. None of the parties challenged this juror, but after a recess, the trial court struck the juror for cause because it believed that the juror could not grasp the legal issues to be decided. The trial court also stated for the record that the juror's fre-

quently unresponsive answers to questions implied that he might not follow instructions, that he disrupted the functioning of the jury, and that he seemed too preoccupied with his employment to properly attend to his duties as a juror.

Every trial court has the inherent discretion to excuse prospective jurors. *Campbell v. State* (1989), 547 N.E.2d 843, 844. It abuses that discretion only when it exercises it in an illogical or arbitrary manner. *Id.* The trial court stated for the record its reasons for excusing the prospective juror, and we see nothing illogical or arbitrary in the reasons it gave. The trial court was certainly in a better position than we to judge the fitness of the juror; we cannot say that it abused its discretion in excusing the juror.

### V

Owens argues that it was reversible error for the trial court to permit Indiana State Trooper Jon Oldham, the chief investigating officer, to testify about the content of conversations he had with State's witnesses Huntington and Hendricks.

### A

Over a continuing objection, the trial court permitted Trooper Oldham to testify about statements Huntington made to him. Oldham testified that Huntington told him he, along with Michael Owens and Horan, saw and touched a dead body at Devil's Elbow. Oldham also said Huntington told him how Owens urinated on the body and jerked a necklace off the body. The trial court ruled the testimony admissible because it showed what led Trooper Oldham in his investigation.

Huntington followed Trooper Oldham on the witness stand. Huntington stated that he saw Michael Owens urinate on the decedent and rip a necklace off of the decedent's body. In the middle of Huntington's testimony, the prosecutor requested that the trial court admonish the jury that Trooper Oldham's testimony about Huntington's statements had been offered not for the truth of the statements, but to show the investigative process. This the trial court did.

Hearsay is an out-of-court statement offered to prove the facts asserted by the statement. *Buie v. State* (1994), Ind., 633 N.E.2d 250, 255. Hearsay is generally inadmissible, *Mullins v. State* (1995), Ind., 646 N.E.2d 40, 48, but may be admitted if the hearsay fits into a judicially or statutorily created exception to the general prohibition against the admission of hearsay. *Id.* We agree with Owens that it was error for the trial court to permit Trooper Oldham to testify in detail about Huntington's statements to him. The trial court could have limited Trooper Oldham's testimony to the fact that he took certain steps in response to what Huntington had told him. It did not. *See Williams v. State* (1989), Ind., 544 N.E.2d 161, 162–63.[8]

Although admission of Huntington's statements through the testimony of Trooper Oldham was error, we think the error was harmless in this case. First and foremost, Huntington himself testified that he did in fact witness the events that Trooper Oldham stated that Huntington told him he saw. Second, in *Williams,* we said that "[w]hen approving the admission of such testimony, this Court requires a reasonable level of assurance that such testimony was not offered by the proponent nor received by the trier of fact as evidence of the truth of the third party's statement." *Id.* at 162–63. The trial court admonished the jury that Huntington's statements had not been offered for their truth, but to explain the investigative process. We have said that "[a] timely and accurate admonition is presumed to cure any error in the admission of evidence." *James v. State* (1993), Ind., 613 N.E.2d 15, 22 (citing *Green v. State* (1992), Ind., 587 N.E.2d 1314, 1317). We think that the admonishment in this case provides us with that reasonable level of assurance that the hearsay testimony was not offered for the truth of Huntington's statements. We therefore hold that the erroneous admission of portions of Trooper Oldham's testimony did not prejudice Owens's substantial rights,

---

8. *See also Craig v. State* (1994), Ind., 630 N.E.2d 207, 211.

Ind.Trial Rule 61, and does not now require reversal of Owens's convictions.

## B

■ After Hendricks had testified, the State recalled Trooper Oldham to the stand. Hendricks had given Trooper Oldham two tape-recorded statements before trial, and the State asked Trooper Oldham, over objection, whether the two statements had been consistent. He replied that they had been.

The State argues that Trooper Oldham's testimony was admissible under our decision in *Modesitt v. State* (1991), Ind., 578 N.E.2d 649. In *Modesitt,* we adopted Federal Rule of Evidence 801(d)(1), *see now* Ind.Evidence Rule 801(d)(1), which provides in part that "a prior statement is admissible as substantive evidence only if the declarant testifies at trial and is subject to cross examination concerning the statement and the statement is ... (b) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication [or] of improper influence or motive...." *Modesitt,* 578 N.E.2d at 653.

Trooper Oldham's conclusion that Hendricks's prior statements were consistent did not fit the exception for prior consistent statements provided for by Federal Rule of Evidence 801(d)(1)(b). Even assuming, as the State argues, that the Owens's cross-examination of Hendricks subjected Hendricks to an implied charge that he had recently changed his tune, as it were, the State should have offered the prior statements themselves to rebut that charge, and left it to the jury to draw its own conclusions with respect to the consistency of those statements with Hendricks's trial testimony. Trooper Oldham's bare conclusion that the two prior statements were consistent with each other was, in fact, irrelevant if the State was attempting to rebut a charge that Hendricks had changed his testimony for trial: that conclusion in no way connected Hendricks's two prior statements to his trial testimony.

■ Again, however, although it was error for the trial court to permit Trooper Oldham to testify that Hendricks's prior statements were consistent with each other, we do not think the error requires reversal of Owens's convictions. The events including and surrounding the beating of Bennett were largely uncontested. Owens did not argue at trial and does not argue on appeal that he did not perform the brutal acts attributed to him by various witnesses. He similarly did not argue at trial and does not argue on appeal that he did not utter the words that were the basis of the intimidation counts. Owens's consistent claim has been that either (i) he was too drunk to be criminally liable for the charged acts or (ii) he intended no more than to beat Bennett and that he did not intend any of his threats to be taken seriously. That is, Owens argued at trial and now argues on appeal that either he could not have had or did not have the *mens rea* required to commit the crimes with which he was charged. Because the jury could only have inferred Owens's mental state from his acts and words, we do not think that the impermissible and even irrelevant witness-bolstering provided by Trooper Oldham's testimony prejudiced Owens's substantial rights. We therefore do not reverse his convictions for this trial error. T.R. 61.

## VI

■ Owens argues that the trial court should have granted his motion to suppress evidence seized by the police from the Thunderbird. He argues that his motion should have been granted because the warrant authorizing the search was impermissibly based upon unreliable hearsay and because the police filed no return on the warrant with the issuing court. We find no merit to either argument that Owens advances.

Both Trooper Oldham and Huntington testified at the probable cause hearing that the trial court conducted before issuing a warrant commanding a search of the Thunderbird. Huntington testified that Owens and Horan had told him that they had been in a fight with Bennett. Huntington also testified that he personally saw Bennett's dead body at Devil's Elbow and that Owens and Horan loaded the body into the trunk of the Thunderbird. Although what Horan and Owens told Huntington was hearsay, Huntington's

testimony about what he personally witnessed was not. The non-hearsay portion of his testimony provided at least a fair probability that a crime had been committed and so justified the issuance of a warrant to search the car for Bennett's body. *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332–33, 76 L.Ed.2d 527 (1983).

It is true that to this date the police have made no return listing the items seized on the warrant issued to search the Thunderbird. That the officer executing the search make such a return is required by Indiana Code § 35–33–5–4(1) (1993). At the same time, Owens does not claim that Bennett's body was found in a search other than of the Thunderbird or that he has been otherwise prejudiced by the police's failure to make the statutorily required return. Without a demonstration of prejudice resulting from the failure to file the return, we do not think such a failure warrants the suppression of evidence otherwise properly seized. *Cf. Webster v. State* (1991), Ind.App., 579 N.E.2d 667, 670 (when there is a delay in filing a return on a warrant, a defendant must demonstrate prejudice resulting from the delay in order to justify suppression). The trial court committed no error in overruling Owens's motion to suppress the evidence related to Bennett's body.

## VII

Lastly, Owens argues that his convictions and sentences for Murder and Battery subjected him to double jeopardy. We agree.

Count V of the information charged Owens with Murder and read in relevant part:

On or about June 22, 1991, in Ripley County, State of Indiana, Michael C. Owens, and Brian E. Horan did knowingly kill another human being, to wit: Gary E. Bennett, Jr., *by striking, beating, hitting and kicking Gary E. Bennett, Jr. with their hands and feet and by throwing his body against a motor vehicle* while said acts resulted in the death of Gary E. Bennett, Jr.

(Emphasis added) (R. 40). Count II of the information charged Owens with Battery as a Class C felony and read in relevant part:

On or about June 22, 1991, in Ripley County, State of Indiana, Michael C. Owens, and Brian E. Horan did knowingly touch Gary Bennett, Jr. in a rude, angry or insolent manner, to wit: *by striking, beating, hitting and kicking Gary E. Bennett, Jr. with their hands and feet and by throwing his body against a motor vehicle,* said actions of defendants created a substantial risk of death, unconsciousness, extreme pain, and impairment of the function of his reproductive organs.

(Emphasis added) (R. 38–39). The instructions to the jury on the murder and battery counts mirrored the charges in the information.

It is apparent from the charges in the information and the instructions that in order to obtain a conviction for Battery in this case, the State was not required to prove any fact in addition to those facts that it was required to prove to obtain a conviction for Murder. In particular, all the State was required to show to obtain a conviction for Battery was that the very same acts that actually caused Bennett's death also created a substantial risk of death. Although the State could have charged Battery in the first beating and Murder in the second, it chose, for whatever reason, not to do so. Consequently, under our decisions in *Buie v. State,* 633 N.E.2d at 260–61 and *Derado v. State* (1993), Ind., 622 N.E.2d 181, 184, we must vacate Owens's conviction and eight-year sentence for Battery.

### Conclusion

Accordingly, we affirm Owen's convictions on Counts III, IV, VI, & VII for Intimidation and on Count V for Murder. We vacate Owens's conviction and sentence on Count II for Battery.

SHEPARD, C.J., and DeBRULER, DICKSON and SELBY, JJ., concur.