Ivory BARNES, Appellant
(Defendant below),

v.

STATE of Indiana, Appellee
(Plaintiff below).

No. 47S00–9611–CR–710.

Supreme Court of Indiana.

March 11, 1998.

Michelle L. Woodward, Bedford, for Appellant.

Jeffrey A. Modisett, Attorney General, Katherine L. Modesitt, Deputy Attorney General, Indianapolis, for Appellee.

BOEHM, Justice.

Ivory Barnes was convicted of murder and sentenced to sixty-five years imprisonment. His direct appeal presents several issues for our review that we restate as follows:

I. Did the State prove beyond a reasonable doubt that Barnes knowingly killed the victim despite his claim of alcohol intoxication?

II. Did the trial court err in replacing one of the original jurors with an alternate?

III. Did the trial court err in denying Barnes's motion for a change of venue?

We affirm.

### Factual and Procedural Background

On August 9, 1995, Barnes and Gary Lundy were drinking together in a bar in Bedford, Indiana. The two eventually drove in Lundy's truck to Barnes's mother's house nearby. They were alone in the house for an undefined time before Barnes drove away in the truck without Lundy. After the truck stalled at an intersection in Bedford, a police officer, who noticed that Barnes had blood on his hands but made nothing of it at the time, helped him push it to the side of the road. Barnes declined the policeman's offer for a ride and walked back to his mother's house. In the driveway Barnes encountered housemate Melvin Britt, who was just returning from work. Britt testified that Barnes said he wanted to move "a guy inside ... downstairs" before his mother got home. The two talked outside for "a little while" when Barnes's mother arrived. The three then entered the house and Britt found Lundy's body wrapped in a sheet on the kitchen floor. Britt immediately called 911 and Bedford police were dispatched to the scene. Barnes and one of the officers instantly recognized each other from Barnes's car troubles about a half hour earlier. The police found Lundy's body in the kitchen lying in a pool of coagulated blood. One officer testified that blood was spattered "all over" the kitchen. Meanwhile, a verbal altercation ensued outside between Barnes and Britt. Barnes was arrested for disorderly conduct after he ignored three warnings from police to "settle down."

The physical evidence pointed to Barnes as the assailant. His fingerprints were found on two items recovered from the kitchen—a bloody meat cleaver and a metal folding chair. Blood found on several items—the chair, a knife also recovered from the kitchen, Barnes's clothes, and his arms and fingers—was subjected to DNA testing. The resulting genetic profile showed that the blood could not have been Barnes's blood, was the same type as Lundy's, and was found in one of every 6250 Caucasians (Lundy was Caucasian). The forensic pathologist who conducted the autopsy testified that Lundy died from suffocation caused by extensive blunt-force fractures of the larynx. The evidence showed that Lundy also suffered multiple stab wounds and bruises to the neck

and facial area. A jury convicted Barnes of murder and he appeals.

## I. Intoxication Defense

Barnes's defense at trial was voluntary intoxication.[1] The trial court instructed the jury on that issue and there is no claim that the substance of those instructions was erroneous. Rather, Barnes contends that the State failed to prove beyond a reasonable doubt that he had the required mental element for murder.

Unless otherwise specified, the following is Barnes's account. He began drinking beer in the afternoon on the day of the killing, first alone and then with his brother and several mutual friends. Barnes eventually made his way to the bar where he met Lundy. The two had no prior acquaintance. Lundy bought Barnes at least one drink and suggested they go to a different bar. Barnes agreed but stated that he wanted to stop at his mother's house to get money. Lundy drove the two to the house where Barnes entered through a window because he did not have a key. As Barnes went to get a beer in the kitchen, Lundy assaulted Barnes from behind with a chair. Barnes testified that he could not remember what happened after that point and that he next saw Lundy on the floor. He "panicked" and decided to leave in Lundy's truck to find his brother back at the bar. When asked by his lawyer if he killed Lundy, Barnes replied: "I can't remember doing it, but everything points to me...." When the State asked Barnes a number of questions about his possible use of the items found in the kitchen against Lundy, Barnes answered over and over: "I don't remember." Although there was testimony that Barnes drank beer throughout the day, the precise amount of alcohol he consumed before going to the bar is unclear. The bartender testified that Barnes had three or four beers and two shots of whiskey. The officer who helped Barnes push Lundy's truck to the side of the road testified that he had no reason to believe that Barnes was intoxicated. Britt stated that Barnes smelled of alcohol when they met at the house and Barnes's brother testified that

Barnes was slurring his words outside of the bar when he left with Lundy.

Whether the defendant was so intoxicated that he could not form the *mens rea* required for the crime is a question for the trier of fact. *Owens v. State,* 659 N.E.2d 466, 472 (Ind.1995). The conviction will be affirmed if there was substantial evidence of probative value that would have allowed the factfinder to conclude beyond a reasonable doubt that the defendant formed the required mental element. *Id.* Evidence of capacity to form criminal *mens rea* includes ability to "devise a plan, operate equipment, instruct the behavior of others or carry out acts requiring physical skill." *Terry v. State,* 465 N.E.2d 1085, 1088 (Ind.1984). Other relevant considerations include the defendant's ability to attempt to hide his wrongdoing or take himself from place to place after the crime. *Montgomery v. State,* 521 N.E.2d 1306, 1308 (Ind.1988). If the defendant was able to form the required mental element of the crime, the degree of intoxication is immaterial. *State v. Van Cleave,* 674 N.E.2d 1293, 1303 (Ind.1996), *reh'g granted in part,* 681 N.E.2d 181 (Ind.1997), *cert. denied,* — U.S. ——, 118 S.Ct. 1060, 140 L.Ed.2d 121 (1998).

Barnes was charged with "knowingly" killing Gary Lundy. IND.CODE § 35–42–1–1(1) (1993). "A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." IND.CODE § 35–41–2–2(b) (1993). The State contends sufficient evidence was presented showing that Barnes was aware of his actions. We agree. Barnes was able to formulate a plan after the killing—seeking out his brother and telling his housemate Britt that he wanted to move Lundy "downstairs" before his mother got home. Wrapping the body in a sheet and fleeing in Lundy's truck show "knowledge of the criminality of his actions." *Van Cleave,* 674 N.E.2d at 1304. And despite consuming alcohol before the crime, Barnes was able to engage in acts requiring physical dexterity, including climbing through a window to get

---

**1.** After the trial in this case, the statute providing for voluntary intoxication as a defense was amended to eliminate that defense. 1997 Ind. Acts. P.L. 210, § 4 (effective July 1, 1997).

into his mother's house, wrapping Lundy's body in a sheet, driving Lundy's truck, and walking back to the house after the vehicle overheated. Indeed, the gravamen of Barnes's testimony was not that he was incapable of "knowing" conduct, but rather that he had no memory of what occurred. Memory loss alone, however, is not inconsistent with ability to form criminal *mens rea.* *See, e.g., Vickers v. State,* 653 N.E.2d 110 (Ind.Ct.App.1995) (in prosecution for resisting law enforcement, defendant claimed to remember very little of the pursuit due to intoxication); *cf. McClain v. State,* 678 N.E.2d 104, 107 n. 5 (Ind.1997) ("It is one thing to say a person acted involuntarily, and quite another to say that the person has no memory of the event.") (citations omitted). To the extent he asserted a lack of criminal culpability due to intoxication, the jury could have found Barnes's account to be not credible in light of the evidence indicating his awareness of his actions before and after the killing. In sum, substantial evidence was presented that would have allowed the jury to conclude beyond a reasonable doubt that Barnes knowingly killed Gary Lundy.[2]

## II. Juror Dismissal

■ Barnes next argues that the trial court erred in replacing one of the original jurors with an alternate. Trial judges have "significant leeway" in making this determination because "they see jurors firsthand and are in a much better position to assess a juror's ability to serve without bias or intimidation and decide the case according to law." *Jervis v. State,* 679 N.E.2d 875, 881–82 (Ind. 1997); *see also* Ind. Trial Rule 47(B). The decision to replace a juror with an alternate is reviewed for an abuse of discretion. *Jervis,* 679 N.E.2d at 881. Just before opening statements, the juror in question told the

court that he knew Barnes's brother from work. It is unclear whether the two men still worked for the same company at the time of trial. Although the juror indicated that he and the brother had never discussed the case, the court dismissed the juror over Barnes's objection.

■ Barnes correctly observes that a juror's relationship with a State's witness is not per se disqualifying. *See, e.g., Grey v. State,* 553 N.E.2d 1196, 1199 (Ind.1990). However, that general rule is the beginning, not the end, of the analysis. The claim here turns on the critical role of firsthand observation in determining whether any juror—irrespective of relationships with expected witnesses—may be unable to reach a decision free from extraneous considerations. The juror in this case asserted several times that he believed he could render a verdict based on the evidence. Expressing concerns about his "demeanor," the trial court nonetheless dismissed him and explained that "this juror appeared hesitant in spite of my repeated questions.... So, based on everything I've seen and heard, I am excusing him." The court's concern was grounded in an apparent pending battery charge against Barnes's brother and the juror's possible fear of reprisals in light of the charge. Barnes does not contend that the replacement was biased and alternate jurors are presumed to be equal to the task. *Jervis,* 679 N.E.2d at 882. Because the decision to dismiss the juror here was reasonable based on the above factors, the trial court did not abuse its discretion.

## III. Change of Venue

■ Finally, Barnes argues that the trial court erred in denying his motion for a change of venue. The defendant is entitled to a change of venue upon a showing that jurors will be unable to disregard precon-

2. As a corollary to the intoxication issue, Barnes advances the novel theory that he was "precluded" from offering a viable intoxication defense because Bedford police did not give him a blood-alcohol test after he was arrested. Barnes maintains that the arresting officers knew, or at least should have known, that he was intoxicated, but he points to no testimony that would support that conclusion. Irrespective of whether Barnes's condition was apparent to the officers, he cites no authority for the proposition that the police

had an obligation to give him a blood-alcohol test even if they had a right to do so. At bottom, Barnes attempts to blur a crucial distinction: while the *Brady* doctrine imposes a federal constitutional duty on the State to *preserve* exculpatory evidence in certain circumstances, *see generally Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the police have no obligation to gather that evidence on the defendant's behalf. Accordingly, this claim presents no basis for reversal.

ceived notions of guilt and render a verdict based on the evidence. *See, e.g., State v. Moore,* 678 N.E.2d 1258, 1262 (Ind.1997), *petition for cert. filed,* —— U.S. ——, 118 S.Ct. 1528, 140 L.Ed.2d 678; *see also* Ind. Crim. Rule 12. The denial of a motion for a change is reviewed for an abuse of discretion. *Bradley v. State,* 649 N.E.2d 100, 108 (Ind. 1995). Barnes offered several reasons for seeking a change: (1) the low percentage of African–Americans in Lawrence County gave rise to a presumption of racial bias that deprived Barnes, an African–American, of a fair trial; and (2) prejudicial publicity about the case tainted the jury pool. The State responds that Barnes has not shown that the jury was unable to render a verdict based on the evidence and that the ethnic makeup of Lawrence County did not automatically undermine his right to a fair trial.

 In response to questions from Barnes's counsel, three prospective jurors admitted during voir dire that they had used a particular racial epithet derogatory of African–Americans in the six months prior to the trial. Two were excused (by whom is unclear from the record) and the third was allowed to serve without further inquiry on the subject from either side. Barnes did not seek to excuse the third juror for cause and in this appeal he does not challenge that juror's fairness or the decision to allow her to sit on the jury. Having failed to challenge her at trial, he cannot now question the outcome based on her participation. *Short v. State,* 443 N.E.2d 298, 306 (Ind.1982). Presumably recognizing that any claim of error on that ground is waived, Barnes instead maintains that the admitted use of racial epithets by the three prospective jurors reflected a pervasive local bias against African–Americans. With respect to those three, this certainly illustrates possible if not likely prejudice on grounds of race, but it is anecdotal evidence that does not necessarily reflect widespread racial bias. Barnes further contends, and the State does not dispute, that less than one per cent of Lawrence County is African–American. We recently reiterated that al-

though these demographics might reflect some possibility of racial bias, a mere possibility of prejudice does not suffice to obtain a change of venue. *Moore,* 678 N.E.2d at 1263. Rather, there must be a showing that the jury could not be impartial. *Evans v. State,* 563 N.E.2d 1251, 1258 (Ind.1990), *modified on reh'g,* 598 N.E.2d 516 (Ind.1992). In the absence of some proof of systematic bias—and Barnes offers none—his claim is reduced to the mere possibility of prejudice held to be insufficient in *Moore* and other cases. *See also Davidson v. State,* 580 N.E.2d 238, 244 (Ind.1991). Because Barnes does not argue that any of the seated jurors was unable to decide the case according to law, the trial court did not err in denying his motion for a change of venue due to racial bias.

The last contention is that negative pretrial publicity about the case planted preconceived notions of guilt in the minds of potential jurors.[3] Barnes observes that the killing and pretrial proceedings were covered in a local newspaper and on local radio stations. However, other than references to Lundy's death as a "murder" and descriptions of the meat cleaver and knife as "murder weapons," Barnes does not maintain that the media coverage distorted the facts. Rather, without attempting to show that the jury's view of the case was irreparably tainted due to news reports, Barnes again suggests a presumption of community bias: "Potential jurors in Lawrence County would be unable to realistically set aside the prejudice resulting from the publicity and render a fair verdict."

 There is no such presumption. Indeed, reversal on this issue requires more than a bald assertion because exposure to press coverage is not disqualifying. IND. CODE § 35–37–1–5(b) (1993) (a prospective juror may be allowed to serve despite preconceived notions of guilt due to pretrial publicity so long as the juror states, and the court concludes, that he or she can render a verdict based on the law and the evidence). Although any news story that implicated Barnes in the killing was "prejudicial," this

**3.** The two grounds for a change that Barnes renews in this appeal—racial bias and prejudicial publicity—are not linked. The press coverage of the case, at least as reflected in this record, was devoid of any reference to Barnes's race.

does not rise to the level of "prejudicial publicity" that would have required a change of venue so long as the reports do not contain inadmissible evidence or distort the facts. *Evans,* 563 N.E.2d at 1258. Even where the press coverage crosses that line, the defendant must show that jurors are unable to render a verdict on the evidence because of the reports. *Moore v. State,* 515 N.E.2d 1099, 1102 (Ind.1987). The trial court held a hearing on Barnes's motion for a change of venue. We have reviewed the newspaper articles and radio report transcripts that were submitted at that hearing. The media coverage in this case was almost completely coextensive with (and therefore cumulative of) the evidence presented at trial and did not unfairly portray Barnes as guilty despite frequently mentioning that he was the suspect in the case. We thus see no actual prejudice to Barnes nor any good reason to presume that the jury pool was otherwise unfairly tainted. In addition, Barnes has not directed our attention to any evidence in the record showing that jurors were unable to be impartial due to the pretrial media coverage. As we have held in many prior decisions, this also is fatal to his claim. *See, e.g., White v. State,* 687 N.E.2d 178, 179 (Ind.1997); *Owens v. State,* 659 N.E.2d 466, 475 (Ind.1995); *Harrison v. State,* 644 N.E.2d 1243, 1249 (Ind.1995). In sum, the trial court did not err in denying Barnes's motion for a change of venue.

### Conclusion

The judgment of the trial court is affirmed.

SHEPARD, C.J., and DICKSON, SULLIVAN and SELBY, JJ., concur.