**Terry HUBER, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 67A05–0311–CR–585.**

Court of Appeals of Indiana.

April 6, 2004.

William Bracken, Brownsburg, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Michael Gene Worden, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Defendant, Terry Huber (Huber), appeals his convictions for intimidation, a Class D felony, Ind.Code § 35–45–2–1, and invasion of privacy, a Class B misdemeanor, I.C. § 35–46–1–15.1.

We affirm in part, reverse in part, and remand.

## ISSUES

Huber raises four issues on appeal, which we consolidate and restate as follows:

1. Whether the trial court erred in denying his Motion for Directed Verdict following the presentation of the State's case-in-chief at trial;

2. Whether the evidence is sufficient to support his conviction for intimidation, a Class D felony; and

3. Whether the evidence is sufficient to support his conviction for invasion of privacy, a Class B misdemeanor.

## FACTS AND PROCEDURAL HISTORY

In late 2000, while Huber and his wife, Julie Huber (Julie), were in the middle of a divorce, Julie obtained three Protective Orders against Huber that were issued by a court of law on November 20, 2000, December 15, 2000, and December 19, 2000, respectively. These Protective Orders were issued to restrain Huber from abusing, harassing, or disturbing the peace of Julie, either by direct or indirect contact, and remained in effect during the pendency of the Hubers' divorce, which was finalized on April 20, 2001. Huber had notice of the Protective Orders prior to January 30, 2001.

During this same time period, from November 8, 2000, Julie utilized the services of Suzie Ginn (Ginn), a domestic violence advocate for Putnam County Family Support Services. On January 29, 2001, Ginn placed a telephone call to the number she believed to be Julie's home number, and left a message in which she identified herself and asked Julie to return her call.

However, the telephone number was actually Huber's home number, and he telephoned Ginn's office later that day and left a message for Ginn to return his call. On January 30, 2001, Ginn returned Huber's call. Ginn identified herself and said that she was aware of the mistake in telephone numbers. Huber identified himself as "Julie's husband" and became very agitated. (Transcript p. 73). Huber yelled at Ginn, telling her he could not understand why her agency was helping Julie and no one was helping him, and that Julie was the one who "caused all of this." (Tr. p. 73).

Huber proceeded to tell Ginn that if she or her agency continued to work with his wife that "things were not going to be real pretty." (Tr. pp. 73-4). He repeated this statement to Ginn three times. When Ginn asked Huber what he meant by that statement, he told Ginn to ask his wife what it meant, because she knew what he meant. Ginn had been working with Julie as a domestic violence advocate since Julie's case was assigned to her on November 8, 2000. Based on her interactions with Julie, Ginn understood Huber's remarks to be a threat meaning he would "come after" anybody who was helping Julie. (Tr. p. 74).

Huber also asked Ginn to call Julie for him to ask her why she was doing this to him. Ginn told Huber she could not do that. Thereafter, for the remainder of January 30, 2001, and into January 31, 2001, Huber continued to call Putnam County Family Support Services, asking to speak with Ginn, which left her frightened. Ginn declined to speak with him again.

As a result of Ginn's telephone interaction with Huber, the State filed two informations against Huber charging him with Count I, intimidation, a Class D felony, and Count II, invasion of privacy, a Class

B misdemeanor.[1] On September 26, 2001, the trial court conducted a jury trial. Following the trial, the jury convicted Huber, as charged. On November 1, 2001, a sentencing hearing was held in which the trial court sentenced Huber to three years in the Department of Correction on Count I, and 180 days on Count II, to be served concurrently to Count I. Huber received credit for 59 days served.

Huber now appeals. Additional facts will be supplied as necessary.

## DISCUSSION AND DECISION
### I. Directed Verdict

Huber contends that the trial court erred in denying his Motion for a Directed Verdict at trial, following the State's case-in-chief. Specifically, he argues that there was no evidence of any threat to commit a forcible felony in retaliation for past lawful acts, with regard to the charge of intimidation.

■ At the outset, we note that Huber presented evidence after the trial court denied his Motion for a Directed Verdict. As a result, this issue is waived on appellate review. *Guy v. State*, 678 N.E.2d 1130, 1134 (Ind.Ct.App.1997). Waiver notwithstanding, in order for a trial court to grant a directed verdict, there must be a complete lack of evidence on a material element of the crime or the evidence must be without conflict and susceptible to only an inference in favor of the defendant's innocence. *Id.* However, if the evidence is sufficient to support a conviction on appeal, then the trial court's denial of a Motion for a Directed Verdict cannot be in error. *Id.* Consequently, we will determine the issue of the trial court's denial of Huber's Motion for a Directed

Verdict as to the count of intimidation together with the sufficiency of evidence issue below.

### II. Sufficiency of the Evidence
#### A. Standard of Review

■ In reviewing sufficiency of the evidence claims, this court does not re-weigh the evidence or assess the credibility of witnesses. *Cox v. State*, 774 N.E.2d 1025, 1028–29 (Ind.Ct.App.2002). We consider only the evidence most favorable to the verdict, together with all reasonable and logical inferences to be drawn therefrom. *Alspach v. State*, 755 N.E.2d 209, 210 (Ind.Ct.App.2001), *trans. denied.* The conviction will be affirmed if there is substantial evidence of probative value to support the conclusion of the trier-of-fact. *Cox*, 774 N.E.2d at 1028–29.

#### B. Intimidation

■ Huber asserts that the evidence was insufficient to support his conviction for intimidation, a Class D felony. In particular, he argues that his statement to Ginn, "things were not going to be real pretty" does not constitute a threat to commit a forcible felony for any prior lawful act by Ginn, as required by Indiana law. (Tr. pp. 73–4).

Indiana Code section 35–45–2–1 provides, in pertinent part, as follows:

(a) A person who communicates a threat to another person, with the intent that the other person be placed in fear of retaliation for a prior lawful act ... commits intimidation, a Class A misdemeanor.

(b) However, the offense is a Class D felony if the threat is to commit a forcible felony.

---

**1.** The State also filed Count III, intimidation, a Class D felony; however, following the State's case-in-chief at trial, the trial court granted Huber's Motion for Directed Verdict as to Count III, so it is not at issue here.

A "forcible felony" is a "felony that involves the use or threat of force against a human being, or in which there is imminent danger of bodily injury to a human being." I.C. § 35–41–1–11.

In the instant case, Ginn testified that, when she spoke to Huber on the phone on January 30, 2001, he became very agitated and yelled at her throughout the conversation. He told Ginn three times that, if she or her agency continued to work with Julie, "things were not going to be real pretty." (Tr. pp. 73–4). When Ginn asked Huber what he meant by that, he told her to ask Julie, because he had said the same thing to Julie in November of 2000, so she knew what it meant. Ginn testified that she also had a pretty good idea of what Huber meant, because she had been working with Julie as a domestic violence advocate since November 8, 2000. Ginn understood Huber's statement to be a threat to "come after anybody who was working with Julie." (Tr. p. 74).

We have previously determined that such threats of potential, nonspecific violence constitute a threat to commit a forcible felony. For instance, in *Williams v. State*, 677 N.E.2d 1077, 1079 (Ind.Ct.App. 1997), we determined that Williams' statement to a State's witness in a criminal action that "[you] better not testify against [me]," was sufficient to sustain his conviction for a count of intimidation, a Class D felony. Similarly, here, Huber threatened Ginn, who had been lawfully acting as a domestic violence advocate for Julie since November of 2000, that, if she continued to work with Julie, "things were not going to be real pretty." (Tr. pp. 73–4). As discussed above, Ginn testified that she understood this to be a threat and felt afraid following her conversation with Huber.

We find that Huber's statement to Ginn that "things were not going to be real pretty" if she continued to act as a domes-tic violence advocate for Julie could be construed by a reasonable person to mean that Huber meant he would physically hurt Ginn if she continued to help Julie. (Tr. pp. 73–4). Infliction of serious bodily injury would be chargeable as the forcible felony of battery, a Class C felony. *See* I.C. § 35–42–2–1(a)(3). Moreover, Ginn testified that Huber's threat to her that "things were not going to be real pretty," made her fearful that Huber would "come after" her in retaliation for her work with Julie as a domestic violence advocate. (Tr. p. 73–4). Consequently, we find the evidence sufficient to support Huber's conviction for intimidation, a Class D felony. *See Williams*, 677 N.E.2d at 1083. In addition, because we find the evidence sufficient to support Huber's conviction for intimidation, a Class D felony, we find that the trial court did not err in denying Huber's Motion for a Directed Verdict as to Count I, intimidation, a Class D felony. *See Guy*, 678 N.E.2d at 1134.

### C. Invasion of Privacy

■ Huber also asserts that the evidence was insufficient to support his conviction for invasion of privacy, a Class A misdemeanor. Specifically, he argues that there is no evidence that Ginn actually contacted Julie on his behalf; therefore, he did not violate the Protective Order.

Indiana Code section 35–46–1–15.1, as it existed at the time Huber was charged, provided, in relevant part, that a person who knowingly or intentionally violates a Protective Order to prevent domestic or family violence commits invasion of privacy, a Class B misdemeanor. During the trial, the trial court read a stipulation submitted by the parties that provides as follows:

> The Protective Orders, also referred to as No Contact Orders, were issued by a Court of Law on November 20, 2000;

December 15, 2000; and December 19, 2000, on behalf of a Julie Huber. Terry Huber had notice prior to January 30, 2001. A Protective Order restrains one from abusing, harassing, or disturbing the peace of the petitioner either by direct or indirect contact.

(Tr. pp. 64–5). Our review of the record reveals no additional evidence regarding the Protective Orders other than that they existed and that Huber was aware of them. Therefore, the jury was informed through the stipulation by the parties and the jury instruction regarding the elements of the charge, that, to be convicted of invasion of privacy, Huber must have knowingly or intentionally violated a Protective Order, which means that he abused, harassed or disturbed the peace of Julie, either by direct or indirect contact. Put another way, to violate the protective order, Huber must have contacted Julie, directly or indirectly. The evidence simply does not support this.

In particular, with regard to the charge of invasion of privacy, Ginn testified on direct examination as follows:

Q. And what makes you say that he was angry?

A. He was yelling. He was yelling through the conversation. I tried to apologize for making that initial call. He asked me to call Julie and talk to [her] on his behalf. I told him that I could not do that.

Q. Did he tell you what he wanted you to say to Julie when you called her?

A. He wanted me to ask her why she was doing this to him.

Q. Did he elaborate on what he meant?

A. No, no.

Q. Okay. But he did specifically ask you to contact her or to telephone her and talk to her on his behalf?

A. Yes.

Q. And you told him that you could not do that?

A. I told [him] I could not, that's correct.

(Tr. pp. 74–75). Given this evidence, we find that the State failed to carry its burden on the material element of Huber violating a Protective Order by contacting Julie, either directly or indirectly. Ginn specifically told Huber that she could not convey the message; therefore, Huber's attempt to contact Julie indirectly through Ginn was incomplete. Accordingly, we must reverse Huber's conviction for invasion of privacy, a Class B misdemeanor.

## CONCLUSION

Based on the foregoing, we conclude that the evidence is sufficient to support Huber's conviction for Count I, intimidation, a Class D felony. Consequently, we find no error in the trial court's denial of Huber's Motion for Directed Verdict as to Count I. Further, we find that the evidence was insufficient to support Huber's conviction for Count II, invasion of privacy, a Class B misdemeanor. Accordingly, we reverse Count II.

Affirmed in part, reversed in part, and remanded.

DARDEN, J., and BAILEY, J., concur.