**Mark M. RANSLEY, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 64A04–0509–CR–541.**

Court of Appeals of Indiana.

July 12, 2006.

Transfer Denied Sept. 19, 2006.

John M. Rhame, III, Rhame & Elwood, Portage, for Appellant.

---

Steve Carter, Attorney General of Indiana, Deanna L. Brunner, Deputy Attorney General, Indianapolis, for Appellee.

## OPINION

KIRSCH, Chief Judge.

Mark M. Ransley ("Ransley") appeals his conviction for intimidation[1] as a Class C felony following a jury trial. On appeal, he raises two issues, of which we find the following dispositive: whether the State presented sufficient evidence that Ransley acted with the intent of placing Nolan in fear of retaliation for a prior lawful act as required under the intimidation statute.

We reverse.

## FACTS AND PROCEDURAL HISTORY

In 2002, Marguerite Reilly and Bernice Ransley owned homes in Valparaiso, Indiana that were next to each other, but separated by a vacant lot. Ransley lived with his mother, Bernice. Matthew Nolan, Reilly's son-in-law, helped Reilly maintain her property. In September 2002, Bernice purchased the vacant lot between the two homes, thus triggering a dispute as to the ownership of a six-foot wide strip of land that ran along the property line. This dispute led to the two families engaging in verbal confrontations and taking overt actions to demonstrate ownership and control of the disputed land.[2] In March 2003, Reilly filed a civil action to quiet title to the disputed strip of land.[3]

On October 3, 2004, Nolan went to Reilly's home to mow her grass and found various items, such as planking, cinder blocks, and assorted wooden stakes, on land he believed was owned by Reilly. Agitated and angry, Nolan threw all the items onto the Ransley property and started yelling toward the Ransley home. Nolan called Ransley names and "asked [Ransley] if he might to [sic] want to come down and harass [Nolan] like he had been harassing [Nolan's] wife and kids." *Tr.* at 125. Believing himself threatened, Ransley called 911. During his conversation with the Porter County Sheriff's Department, Ransley expressed fear and frustration and told the operator that if Nolan were to come onto Bernice's property Ransley would shoot him. After hanging up with the Sheriff's Department, Ransley exited his home and stood on his porch.

Meanwhile Nolan was cutting Reilly's grass, and had started near the disputed portion of land. *Id.* 125–26. Seeing Ransley on the porch, Nolan stopped the mower and, again, began yelling at Ransley from about fifty to seventy yards away. Nolan's words prompted Ransley to leave his porch and walk toward Nolan. While the two men stood about thirty feet apart arguing and challenging each other, Nolan noticed "what looked like a handgun in [Ransley's] waistband." *Id.* at 128. Unsure of whether the gun was real, Nolan continued to yell at Ransley and asked him, "are you gonna use that or, you know, do you still want to come on over here we can still settle this." *Id.* Nolan decided to get something to "even the odds a little bit," and returned to Reilly's garage to grab an axe handle. *Id.* At trial, Nolan testified that, upon returning, Ransley pulled out his handgun and pointed it at Nolan. Nolan did not recall whether Ransley said anything at that time. *Id.* at

---

1. *See* IC 35–45–2–1.

2. Reilly testified that Ransley took down a fence and cut down twenty-year-old lilac bushes on the disputed property.

3. This quiet title action was still pending at the time of trial. *Tr.* at 38–39.

131. Nolan retreated to Reilly's house, had his wife call the police, and went back outside to mow the grass.

Almost a half-hour after Ransley's first call to 911, the police arrived, parked between the two homes, and began questioning Nolan about the altercation. A few minutes later, Ransley approached with the handgun still in his waistband. Seeing this, the police removed the handgun and placed Ransley under arrest. While being handcuffed, Ransley shouted, " 'Why am I being put in handcuffs?' 'This is my property.' 'Eminent domain.' 'They're trying to take my land away from me." ' *Id.* at 239.

Ransley was originally charged with intimidation as a Class C felony. On April 29, 2005, the trial court granted the State's motion to amend that charge.[4] Following a two-day trial, the jury found Ransley guilty of intimidation. He now appeals. Additional facts will be added as needed.

## DISCUSSION AND DECISION

Ransley asserts that the evidence was insufficient to support his conviction for intimidation. In reviewing sufficiency of the evidence claims, this court does not reweigh the evidence or assess the credibility of witnesses. *Huber v. State*, 805 N.E.2d 887, 890 (Ind.Ct.App.2004). We consider only the evidence most favorable to the verdict, together with all reasonable and logical inferences to be drawn therefrom. *Id.* The conviction will be affirmed if there is substantial evidence of probative value to support the conclusion of the trier of fact. *Id.*

Ransley's original information read, in pertinent part, as follows:

---

4. The trial court also granted the State's motion to add Count II—a charge of pointing a firearm, a Class D felony. *See* IC 35–47–4–3.

That MARK M. RANSLEY did on or about the 3rd day of October, 2004, in the county of Porter, State of Indiana, communicate a threat to Matthew Nolan with the intent that he be placed in fear of retaliation for a prior lawful act, to wit: mowing property that belonged to Marguerite Reilly, with said threat to be a forceful felony through the use of a deadly weapon. . . .

*Appellant's App.* at 17. Five days prior to trial, the State filed a motion to amend this count, which read, in pertinent part, as follows:

That Mark M. Ransley did on or about the 3rd day of October, 2004 in the County of Porter, State of Indiana, communicated [sic] a threat to shoot Matthew Nolan with a deadly weapon to wit: Taurus PT99 9 mm semiautomatic pistol with the intent that Matthew Nolan would not come onto his (Ransley's) property and/or that Nolan would be placed in fear for the prior lawful acts including arguing with Ransley . . . .

*Id.* at 19. That same day, Ransley filed a motion objecting to the amendment and requesting a continuance.

Pursuant to IC 35–34–1–5, an information may be amended any time up to thirty days prior to the omnibus date when the defendant is given written notice of the change. If later than thirty days, the court must give all parties adequate notice of the intended amendment and an opportunity to be heard. If the trial court grants the motion to amend, the court shall, on motion by the defendant, order any continuance of the proceedings which may be necessary to accord the defendant adequate opportunity to prepare his defense. IC 35–34–1–5(d).

---

Because the jury found Ransley not guilty of that count, we discuss only the intimidation charge.

Here, the trial court held a hearing to determine whether the amendment—filed by the State just days before trial—should be granted. During this hearing, Ransley's counsel contended that granting the amendment on such short notice would prejudice his case. The trial court granted the State's motion to amend the information, denied Ransley's motion for a continuance, but limited the State's evidence to events that occurred on the day in question.

To support Ransley's conviction for intimidation as a Class C felony, the State was required to prove that (1) Ransley communicated a threat (2) to another person (3) with the intent that the other person be placed in fear of retaliation (4) for a prior lawful act (5) while drawing or using a deadly weapon. IC 35–45–2–1. Failure to prove even one of these elements requires the reversal of Ransley's conviction.

■ Ransley contends that there was insufficient evidence (1) that he communicated a threat to Nolan and (2) that he intended Nolan be placed in fear of retaliation for a prior lawful act. Assuming, without deciding, that there was sufficient evidence that Ransley communicated a threat, we still find insufficient evidence in the record before us to prove that Ransley intended that Nolan be placed in fear of retaliation for a prior lawful act.

We examined Indiana's intimidation statute in *Casey v. State,* 676 N.E.2d 1069, 1072 (Ind.Ct.App.1997). There, we observed,

the State has the burden to show, among other things, that the defendant threatened the victim with the intent that she be placed in fear of retaliation for a prior lawful act. When determining the proper interpretation of a statute, we utilize the well-established rules of statutory construction. When construing a statute, our foremost duty is to determine and give effect to the true intent of the legislature. We endeavor to give the statute in question a practical application so as to prevent absurdity, hardship, or injustice, and to favor public convenience. Additionally, we presume that all of the words appearing in the statute were intended to have meaning. Absent a clearly manifested purpose to the contrary, we endeavor to give the statutory language its plain and ordinary definition.

BLACK'S LAW DICTIONARY 885 (6th ed.1990), defines "lawful" as: "Legal; warranted or authorized by the law; having the qualifications prescribed by law; not contrary to nor forbidden by the law; not illegal." "Retaliation" is defined as "to repay in kind; to return for like; to get revenge." WEBSTER'S COLLEGIATE DICTIONARY 999 (10th ed.1993). Construing these words together, it is apparent that the legislature intended to require the State to prove that the victim had engaged in a prior act, which was not contrary to the law, and that the defendant intended to repay the victim for the prior lawful act. This interpretation is consistent with the few Indiana cases which have considered the sufficiency of the evidence to support an intimidation conviction. Therefore, mere proof that the victim is engaged in an act which is not illegal at the time the threat is made is not sufficient. Rather, the State must establish that the legal act occurred prior to the threat and that the defendant intended to place the victim in fear of retaliation for that act.

*Casey,* 676 N.E.2d at 1072 (citations omitted).

The amended information requires the State to prove that Ransley "communicated a threat to shoot Matthew Nolan with a deadly weapon ... with the intent that

Matthew Nolan would not come onto his (Ransley's) property and/or that Nolan would be placed in fear for the prior lawful acts including arguing with Ransley." *Appellant's Br.* at 19. The first allegation—that Ransley communicated a threat with the intent that Nolan would not come onto his property—fails to allege retaliation for a prior lawful act as required under IC 35-45-2-1. Instead, the alleged threat is aimed at the future action of keeping Nolan off of Ransley's property; therefore, it is not retaliation for a *prior* act. Likewise, entering another's property without permission constitutes criminal trespass under IC 35-43-2-2; therefore, it cannot be retaliation for a *lawful* act.[5]

Unable to prove that keeping Nolan off Ransley's property was a prior lawful act, the State had to prove that Ransley communicated a threat to Nolan intending that he be placed in fear for the prior lawful act of arguing. On the Sunday morning in question, Ransley was on his mother's property when Nolan arrived at the Reilly property to cut the grass. Finding items on land that Nolan believed belonged to Reilly, Nolan became agitated and angry and threw all the items back toward Bernice's property. Meanwhile, at a distance of fifty to seventy yards away, Nolan started calling Ransley names and challenged him to settle their dispute. Believing himself threatened, Ransley called 911. During his conversation with the Porter County Sheriff's Department, Ransley expressed fear and frustration, and told the operator that, if Nolan were to come onto Bernice's property, Ransley would shoot him.

During their altercation, the parties yelled at each other and walked back and forth to various proximities from each other. Nolan testified that the two were yelling at each other and that Nolan "was yelling at [Ransley] the whole time ... yelling the same thing over and over, if he wants to come get some of this then come on with it, you know." *Tr.* at 127. Nolan also testified that after returning with the axe handle, Ransley pulled out his handgun and pointed it at Nolan. *Id.* at 131. When the prosecutor asked if Ransley said anything while pointing the gun, Nolan responded: "I don't recall if he said anything at that time.... I can't—I don't really recall exactly if we're still yelling at that time. I mean, when he pointed the gun at me that's when I just turned around and walked away." *Id.*

■ Although Nolan was given the chance to testify that Ransley had threatened to kill or harm him for the prior lawful act of arguing, he made no such allegation. The 911 recordings supported the fact that Ransley's threats were intended to keep Nolan off his property. The State contends that Ransley was angry from his encounter with Nolan and that this anger prompted his actions. We recognize that a person may be angry enough to commit intimidation. However, anger, without proof of intent to retaliate, is not enough to satisfy the requirements of the statute.

We find insufficient evidence from which the jury could have reasonably concluded that Ransley communicated a threat to Nolan with the intent that he be placed in fear of retaliation for the prior lawful act

---

**5.** During closing argument, the State asserted that Ransley could not use deadly force or threaten deadly force to prevent Nolan from trespassing on Ransley's property. *Tr.* at 274. In its brief, the State essentially concedes that going onto Ransley's property was not a legal act and states: "Defendant argues that Matthew coming onto Defendant's property was not a lawful act. (*Appellant's Br.* at 19–20). Regardless of whether that is true, the information stated 'and/or' the prior lawful act of arguing with Defendant." *Appellee's Br.* at 15.

of arguing. The evidence at trial was limited by court order to the events that occurred on the day in question. While the evidence before the jury made clear that Ransley and Nolan had had an ongoing dispute about the location of their respective mother's and mother-in-law's property line, the evidence presented by the State was not sufficient to prove intimidation. Although in possession of a handgun, Ransley remained on his property and, by the jury's own verdict as to Count II, did not point the gun at Nolan. Nolan was the first to engage in the yelling and Ransley was the first to call the police.

■ We are mindful of the potential that this argument could easily have escalated to a violent encounter, and we do not condone the actions of either party. Nevertheless, the law is well established that criminal statutes must be strictly construed against the State. *Gaddis v. State,* 680 N.E.2d 860, 862 (Ind.Ct.App.1997). Here, we cannot enlarge the meaning intended by IC 35–45–2–1. The State did prove that the two men were yelling, that Ransley had a gun, and that Ransley was trying to prevent Nolan from coming onto his property. However, the State provided insufficient evidence to prove intimidation, i.e., that Ransley communicated a threat to Nolan with the intent that Nolan be placed in fear for the prior lawful act of arguing with Ransley.

Reversed.[6]

SULLIVAN, J., concurs.

DARDEN, J., dissents with separate opinion.

6. In his brief, Ransley also argues that it was error for the trial court to allow the State to amend his information just prior to the scheduled trial because the changes made to the information were matters of substance and, as such, had to be filed thirty days before Ransley's omnibus date. *See* IC 35–34–1–5(b).

DARDEN, Judge, dissenting.

I would respectfully dissent, finding that sufficient probative evidence exists to support the jury's verdict that Ransley committed the offense of intimidation, a class C felony.

At the outset, I note that *Gaddis v. State,* 680 N.E.2d 860 (Ind.Ct.App.1997), and *Johnson v. State,* 743 N.E.2d 755 (Ind. 2001), differ in one respect from the case before us: the intimidation offenses charged therein were class A misdemeanors. Indiana law defines intimidation as, *inter alia,* the communication of "a threat to another person, with the intent that the other person be placed in fear of retaliation for a prior lawful act," which offense is a class A misdemeanor. Ind.Code § 35–45–2–1(a). However, the offense is a class C felony "if, while committing it, the person draws or uses a deadly weapon." *Id.* at (b)(2). Further, the forbidden "threat" is defined as "an expression, by words or action, of an intent to unlawfully injure the person threatened." *Id.* at (c)(1).

In *Gaddis,* after having exchanged incomprehensible hand gestures with another driver, the defendant displayed "the profile" of a handgun in the window of his car but did not point the gun at the other driver or his car. 680 N.E.2d at 862. The *Gaddis* court held, as a matter of law, that the defendant's acts did not constitute a threat "within the meaning of the intimidation statute as there was no evidence of an intent to injure" and reversed his intimidation conviction. *Id.*

Noting that Ransley was acquitted of the amended Count II, and because we find that the State presented insufficient evidence to convict him of intimidation under the amended information, we need not address this issue.

In *Johnson,* our Supreme Court discussed the holding of *Gaddis* and agreed with the "general proposition" that " 'the mere display of a handgun does not express an intention to unlawfully injure a person or his property.' " 743 N.E.2d at 756 (quoting *Gaddis,* 680 N.E.2d at 862). Our Supreme Court then expressly observed that because "the State did not seek transfer in *Gaddis,*" it had not had the "opportunity to evaluate whether the facts in that case demonstrated that the defendant went beyond the 'mere display' of a handgun." *Id.* In *Johnson,* the backseat passenger of a car stopped for a traffic light exited that car to talk with a man on the side of the street. When the light changed, Johnson remained outside the vehicle. Jerome Kreczmer—the driver of the car behind that from which Johnson had emerged—rolled down his window and told Johnson that the light was green and that he wanted to go through the intersection. Johnson responded, "F\* \* \* you." *Id.* Kreczmer again told Johnson that the light was green, the car was obstructing traffic, and he wanted to go. This time, Johnson replied, "Suck my d\* \* \*." *Id.* As Kreczmer started to exit his car, John "lifted his jacket revealing the top of an automatic handgun and stated, 'Don't even think it.' " *Id.* A panel of this court reversed Johnson's conviction of intimidation, as a class A misdemeanor, following the reasoning of *Gaddis.* On transfer, our Supreme Court held that where "the record shows the existence of words or conduct that are reasonably likely to incite confrontation, coupled with the display of a firearm," such would generally be sufficient "to prove that a threat has been communicated within the meaning of the intimidation statute." *Id.* at 756–57. Our Supreme Court held that "evidence that Johnson displayed a firearm combined with telling Kreczmer 'don't even think it,'" after having made "two obscene remarks" to Kreczmer, was

> sufficient for a trier of fact to conclude that Johnson communicated a threat within the meaning of the intimidation statute, namely: Johnson expressed by his words and actions an intention to unlawfully injure Kreczmer. The evidence was also sufficient to show that Johnson threatened Kreczmer with the intent to place him in fear or retaliation for a prior lawful act, namely: asking Johnson to move his car.

*Id.* at 247.

In the case before us, the jury heard testimony establishing that long-standing hard feelings existed between Ransley and Nolan, and that they engaged in a heated verbal exchange on October 3, 2004. The jury also heard testimony to the following. After Mrs. Nolan heard Ransley "ranting and raving," and "shouting and screaming," Nolan ran in the house and told her that Ransley "had pulled a gun" and to call 911. (Tr. 70, 82).[7] Nolan testified that when Ransley was about 30 feet away, he observed what appeared to be a gun in Ransley's waistband; and, that Ransley then pulled the gun and *pointed the gun at him* while the two men stood yelling at each other. Testimony of the two police officers who responded within minutes to the 911 calls established that when they first observed Ransley approaching them, he had a gun in his waistband, and he initially resisted complying with their commands to stop. Officer Eckert testified that upon his arrival, Nolan appeared to be visibly shaken, nervous, and flustered; he also testified without objection that Nolan

---

**7.** In fact, this testimony was elicited three times during cross-examination by Ransley's counsel.

reported that Ransley had *pointed a gun in his direction.* After being taken into custody, Ransley told Officer Harris, who had posed no questions to him, that he "'was gonna shoot somebody.'" (Tr. 241, 257, Ex. 10).

The majority notes that the jury did not convict Ransley of the charge that he had pointed the gun at Nolan. However, I do not find that verdict to be fatally inconsistent with its verdict that Ransley committed the offense of intimidation as charged. *See Owsley v. State,* 769 N.E.2d 181, 183 (Ind.Ct.App.2002), *trans. denied* (verdicts not fatally inconsistent if they can be explained by the fact-finder's exercise of its power to assign the proper weight to and either accept or reject certain pieces of evidence).

Ransley's counsel established through cross-examination of Mrs. Nolan that Nolan had not told her that Ransley pointed a gun at him. Further, Mrs. Nolan's report to 911 did not mention the pointing of a gun. In closing argument, Ransley's counsel referred to Nolan's testimony and the 911 recording as establishing that Ransley had the phone with him as he approached Nolan before allegedly pulling the gun, and argued that it was "almost a physically logistical impossibility" for Ransley to have pointed the gun while also talking on the phone—asserting "the gun was not pointed." (Tr. 284). Further, Nolan was asked to demonstrate how Ransley had motioned with the gun after he pulled it from his waistband. This evidence makes it possible for the jury to have concluded that the State had not proven beyond a reasonable doubt that Ransley had actually pointed a loaded gun at Nolan. To me, the jury's finding that Ransley was not guilty of the crime of pointing a firearm at Nolan does not nullify its finding that Ransley drew the deadly weapon during their verbal altercation.

Pursuant to *Johnson,* when a defendant is charged with the offense of intimidation that does *not* include the statutory element involving a weapon, we consider whether the display of a weapon combined with words and conduct were reasonably likely to incite a confrontation. 743 N.E.2d at 756. The evidence is undisputed that Nolan was yelling at Ransley, and Ransley was yelling back at him. On the 911 tape, played for the jury, Ransley can be heard repeatedly calling to Nolan, "I've got a gun .... I'm waiting for you .... I'm waiting .... I'm waiting .... Come on ...." (Ex. 6). According to the testimony, this was before Ransley started walking toward Nolan, reducing their separation from perhaps 70 feet to where they were 30 feet apart. It was at this distance, Nolan testified, that Ransley pulled the gun from his waistband and pointed it at him. I find the evidence to clearly establish that Ransley "went beyond the mere display of a handgun," *Johnson,* 743 N.E.2d at 756, even if the jury found that he did not point the gun at Nolan. I further find that the "action and conduct" of Ransley was "reasonably likely to incite a confrontation," *id.;* I find also that the evidence supports the conclusion that Ransley's acts and conduct were accompanied by his drawing a deadly weapon. Therefore, I would find that Ransley communicated a threat within the meaning of the intimidation statute, namely: Ransley "expressed by his words and actions an intention to unlawfully injure" Nolan. *Id.* And, I would find the evidence sufficient to prove beyond a reasonable doubt that Ransley "threatened [Nolan] with the intent to place him in fear of retaliation for a prior lawful act," namely: having engaged in the verbal altercation with Ransley. *Id.* Accordingly, I would find that sufficient evidence of probative value exists which supports the jury's verdict that Ransley committed the

offense of intimidation, as a class C felony. Thus, I vote to affirm the trial court.