

FILED

Jun 28 2019, 9:15 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

A. David Hutson
Hutson Legal
Jeffersonville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Supervising Deputy
Attorney General
Indianapolis Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Josh McBride,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | June 28, 2019<br><br>Court of Appeals Case No.<br>18A-CR-580<br><br>Appeal from the Dubois Circuit Court<br><br>The Honorable Mark McConnell, Special Judge<br><br>Trial Court Cause No.<br>19C01-1603-F5-192 |

**Robb, Judge.**

# Case Summary and Issues

[1] Following a bench trial, Josh McBride was convicted of intimidation, a Level 5 felony, and sentenced to four years in the Indiana Department of Correction, with one year to be served on adult day reporting and three years suspended to supervised probation. McBride now appeals his conviction, raising the following dispositive issue for our review: whether his conviction of intimidation is supported by sufficient evidence. The State cross-appeals, raising the issue of whether McBride should be unequivocally prohibited from possessing a firearm during his term of probation. Concluding there was sufficient evidence supporting McBride's conviction of intimidation and that the State's point is well-taken, we affirm the conviction and remand for further proceedings.

# Facts and Procedural History

[2] McBride lived with his longtime girlfriend, Karena Vonderheide, and their three children on property Vonderheide owned in Dubois County. Their property was situated immediately north of property owned by Anderson Valley Christian Church ("Church"). A large stone cross was situated on the south side of Vonderheide's property facing the Church. Church members thought the cross was "beautiful," Transcript, Volume 3 at 126, and "appreciated it[,]" *id.* at 199. McBride, Karena, and their children attended the Church. One Sunday in December 2015, Church member Danny Madden left the service to meet and escort a visitor into the Church. While he was outside,

one of McBride's dogs bit Madden. When discussing the matter with McBride afterwards, Madden asked that the dogs be restrained or kept inside during church services from then on so no other churchgoers were hurt. Although McBride did restrain the dogs, he did not seem to take kindly to the request, because "it seemed like from that Sunday on [McBride and his family] were just very upset all the time." *Id.* at 121. Church members were also "very uneasy" after the dog bite incident because they "didn't know what to expect when [they] came to church." *Id.* at 127-28. "[I]t was something every Sunday. [We] didn't know what was going to happen. Something new came up every Sunday." *Id.* at 203.

[3] Sometime early in 2016, at least one of McBride's dogs died, and McBride believed someone associated with the Church poisoned the dog. Following the dog's death, McBride's son, Damian, entered the Church during Sunday services in early February, walked to the altar and took the microphone without being invited to do so, called Madden a liar, and "just [told congregants] what he thought about us[.]" *Id.* at 198. He alleged there were drug dealers on the Church property and that congregants had "dishonored his mother" because she had been receiving threatening letters. *Id.* Around this same time, the words "Lying hypocrites" were spray painted in red on the horizontal bar of the cross that faced the Church. *Id.* at 127.

[4] Shortly after the incident of Damian "coming in the church house and getting the microphone and talking[,]" *id.* at 220, Madden was on the Church property checking on the progress of a drain line the Church was installing when

McBride and his son approached and McBride told his son to "go get a 45," Tr., Vol. 4 at 11, and threatened to bring guns to the Church next Sunday. Church members then discussed the matter with the Dubois County Sheriff's Office. On February 21, 2016, Church elders signed a letter asking the McBrides not to return to the Church:

> We the officers of the [Church], come forward on behalf of the [Church] to let you know that you are not welcome to attend any services, or to be on the property owned by the [Church].
>
> Please allow this letter to serve as a no trespass warning. Failure to do so will be considered trespassing and law enforcement will be contacted.

State's Exhibit 2, Exhibit Index at 23. The sheriff's office served the letter on the McBrides on February 22.

[5] On Sunday, February 28, when Church members began arriving for services, they found "a decapitated dog [was] hanging from the cross." Tr., Vol. 3 at 16. Shortly before services began at 9:00 a.m., congregants began hearing gunfire. Brenda Madden, Madden's wife, stated that when they arrived at church, "immediately it was pow, pow, pow, pow, pow. I mean, it was really loud. . . . [T]here was just a lot of noise like gunfire and explosions. It was just something that I wasn't expecting. It was kind of scary." *Id.* at 108. Brenda told her husband, "Honey, I'll take the next bullet if there's a bullet coming for these people if we can get peace back in this church[.]" *Id.* The gunfire had already started when Lola Gilmore and her husband arrived at the Church;

Gilmore told her husband that "if he didn't get killed, then [she'd] get out [of the car]." *Id.* at 195. "I was scared, but I thought God would protect me, and I'm 83 years old, so if I get shot going to church, what better way?" *Id.* at 202. She said the gunfire was rapid and "didn't stop." *Id.* at 191. Victor Rickenbaugh saw McBride walking along the property line, firing "just one after another" at the ground in front of him as he moved his arms "back and forth, left and right." *Id.* at 148-49.

[6] Inside the Church, Tamara Weyer was asked to call 911, which she did from a Sunday School room overlooking the McBride property. She described seeing McBride shooting his gun "towards the ground between the church and their house, towards the woods." *Id.* at 19-20. While she was on the phone, she experienced what she described to 911 as a "[v]ery loud explosion. You kind of shook, the church shook, smoke." *Id.* at 21. Several members described the sound as being "like bombs going off[.]" *Id.* at 163. In the meantime, Tamara's husband, Jason, also saw McBride shooting a firearm outside the Church and took their two sons and other kids to the basement. Inside the Church, "[i]t was kind of panic, pretty intense." *Id.* at 96. Jason felt the gunfire was communicating "[a]nger" about the dog bite incident. *Id.* at 101. Scott Weyer, who usually leads the Sunday service, stated the February 28 service was different because there "was a lot of anxiety and fear." *Id.* at 181. He believed the discharge of firearms next door was "trying to scare us and disturb us and disrupt us. That's the way I felt, and that's what I can see on my congregation's face." *Id.* at 182. Tamara felt the gunfire was communicating the threat of

death to her and the congregation because she "didn't know at any moment if they was [sic] going to turn and shoot towards the church." *Id.* at 61. There is no dispute that McBride ultimately did not shoot *at* the Church, "[i]t's just that they were right there beside the church[,]" *id.* at 236, "about on the line" separating the two properties, *id.* at 224.

[7] Sergeant Chris Faulkenburg of Dubois County Sheriff's Department was one of the officers who responded to the 911 call. When he arrived, he advised McBride of the disorderly conduct statute and asked him several times to cease making unreasonable noise. McBride yelled at officers to stay off his property, emphasized his Second Amendment right to have and shoot firearms on his own property, and accused Church members of poisoning his dog. McBride and Damian continued shooting their guns randomly into the dirt at no particular target. Sergeant Faulkenburg also observed McBride riding his ATV up and down the property line and instructing Damian to rev up the engine on a truck. Sergeant Faulkenburg described the ATV as "obnoxiously loud" and stated McBride rode up and down the property line multiple times "looking over at the church, looking [in officers'] direction. It seemed to be that there was no purpose to it, from my perspective, other than to just be loud." Tr., Vol. 4 at 55. Gilmore also noted that "when they got done shooting, they got a four-wheeler out and rip and tore and made noise. Then they got – had an old truck or something [and] revved it up[.]" Tr., Vol. 3 at 203. She believed they were being loud, "hopefully, I guess, so we couldn't hear in church. But we could." *Id.*

[8] Since the incident, regular attendance at the Church has declined by half which Church members attribute to this incident. Tamara Weyer "loved it when [her sons] had friends [stay over] on Saturday night because it meant they would go to church with us[,]" but for "quite a while" after this incident, she would not let her kids have friends over on Saturdays because she did not want "to bring another kid into church and have their life in danger." *Id.* at 38. Brenda Madden stated she is now more aware of her surroundings and does not spend a lot of time at the Church when there is not a service. She is "a little cautious" if a visitor walks in, "[a]nd you shouldn't feel that way. You should want to welcome someone to church and be glad they're there." *Id.* at 113-14.

[9] The State charged McBride with Count I: intimidation as a Level 5 felony for communicating a threat by brandishing and/or discharging a firearm to several named members of the Church with the intent that they be placed in fear of retaliation for the prior lawful act of sending a no trespass letter to him and in committing said act, he drew or used a deadly weapon; Count II: intimidation as a Level 5 felony for communicating a threat by brandishing and/or discharging a firearm to certain named members of the Church with the intent that they alter their Sunday morning activity at the Church against their will and in doing so, drew or used a deadly weapon; Count III: criminal recklessness as a Level 6 felony for recklessly, knowingly, or intentionally discharging a deadly weapon in a way that bullets and/or shrapnel could have been sent toward the Church, creating a substantial risk of bodily injury to certain named members of the Church; Count V: disorderly conduct as a Class

B misdemeanor for recklessly, knowingly, or intentionally disrupting a lawful assembly of persons at the Church; Count VI: disorderly conduct as a Class B misdemeanor for recklessly, knowingly, or intentionally making an unreasonable noise by discharging his firearm next door to the Church during the Sunday service and continuing to do so after being asked to stop; and Count VII: disorderly conduct as a Class B misdemeanor for recklessly, knowingly, or intentionally making an unreasonable noise by riding an ATV next door to the Church during the Sunday service and continuing to do so after being asked to stop.[1] McBride was tried to the bench, and at the conclusion of the trial, the trial court found him guilty of Counts I, II, V, and VI. At McBride's sentencing hearing, the trial court stated:

> I do want to address that although I've entered convictions with regard to Counts I, II, V and VI, that the Court, based upon the continuous crime doctrine, finds that the Defendant's actions share the same time, place, singleness of purpose and continuity of action, that they constitute a single transaction for which only one conviction can be entered. In other words, all of those counts are merged.
>
> The Court, therefore, is going to enter . . . judgment of conviction only with regard to Count II, intimidation, a Level 5 felony.

Tr., Vol. 4 at 205-06.

---

[1] Count IV was dismissed on the State's motion prior to trial.

The trial court sentenced McBride to four years in the Department of Correction, with one year to be served on Level One Adult Day Reporting and three years suspended to supervised probation. One of the terms of his probation provided,

> You shall not purchase, possess, or use any firearm, destructive device or other dangerous or deadly weapon *unless granted written permission* by the Court or your Probation Officer.

Appellant's Appendix, Volume 3 at 222 (emphasis added). However, a No Contact Order While On Probation was also issued at the time of McBride's sentencing stating that he was to have no contact with the Church and its members and that he was "to have no firearms, deadly weapons, or ammunition in [his] possession." *Id.* at 226.

# Discussion and Decision

## I. McBride's Appeal

### A. Standard of Review

When reviewing the sufficiency of the evidence required to support a criminal conviction, we do not reweigh the evidence or judge the credibility of the witnesses. *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009). We consider only the evidence supporting the verdict and any reasonable inferences that can be drawn therefrom. *Morris v. State*, 114 N.E.3d 531, 535 (Ind. Ct. App. 2018), *trans. denied.* Thus, we consider conflicting evidence most favorably to the

verdict. *Silvers v. State*, 114 N.E.3d 931, 936 (Ind. Ct. App. 2018). "We will affirm if there is substantial evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt." *Bailey*, 907 N.E.2d at 1005. It is not necessary for the evidence to overcome every reasonable hypothesis of innocence; it is sufficient if an inference may reasonably be drawn from the evidence to support the verdict. *Silvers*, 114 N.E.3d at 936.

## B. Intimidation

### 1. *Threat to Engage in Conduct Against One's Will*

[12] McBride contends the evidence was insufficient to support his conviction for intimidation. The trial court entered judgment of conviction only on Count II, which charged McBride with intimidation for communicating a threat to certain named members of the Church by brandishing and/or discharging a firearm with the intent that they alter their Sunday morning activity at the Church pursuant to Indiana Code section 35-45-2-1(a)(1). To secure a conviction for intimidation under this subsection, the State is required to prove beyond a reasonable doubt that a person communicated a threat to another person with the intent that the other person engage in conduct against the other person's will. The offense is a Level 5 felony if, while committing it, the person draws or uses a deadly weapon. Ind. Code § 35-45-2-1(b)(2)(A). McBride specifically challenges the evidence that his display and discharge of firearms communicated a threat to the congregation or that "his lawful use of firearms at

his personal residence was intended to force church members to alter their activities at church." Brief of Appellant at 10.

[13] The State did not articulate in the information the threat it alleged McBride made with his actions. However, as possibly pertinent to this case, "threat" is defined by the intimidation statute as:

> an expression, by words or action, of an intention to:
> (1) unlawfully injure the person threatened or another person, or damage property;
> * * *
> (3) commit a crime;
> * * *
> (8) cause the evacuation of a dwelling, a building, another structure, or a vehicle.

Ind. Code § 35-45-2-1(d). Our courts have adopted an objective view of whether a communication is a threat. *Owens v. State*, 659 N.E.2d 466, 474 (Ind. 1995). Further, whether a defendant intended that someone engage in conduct against his or her will depends on the facts and circumstances of each case. *Id.* Therefore, both whether the defendant intended that the victim engage in conduct against his or her will and whether his communications, objectively viewed, were threats are questions of fact for the fact finder to decide. *Id.* A threat is punishable if the speaker "intend[s] his communications to put his targets in fear for their safety, and that the communications were likely to actually cause such fear in a reasonable person similarly situated to the target." *Brewington v. State*, 7 N.E.3d 946, 964 (Ind. 2014), *cert. denied*, 135 S.Ct. 970 (2015).

[14]    McBride notes that in *Gaddis v. State*, 680 N.E.2d 860, 862 (Ind. Ct. App. 1997), *trans. not sought*, this court held that "the mere display of a weapon" which the person charged has a constitutional right to carry is insufficient to constitute a threat under the intimidation statute.[2]  In *Gaddis*, a driver on the interstate felt the car behind him was following two closely but was unable to change lanes due to heavy traffic.  When traffic cleared, the defendant, driving the rear car, changed lanes and the two cars traveled side by side in adjoining lanes for a time long enough for the drivers to exchange hand gestures and words, although the windows of both cars where raised and neither could hear the other.  The defendant also took his handgun from his glove box, displayed it at the window without pointing it at the other driver or his car and then placed it on the console.  The other driver then slowed down and backed off as the defendant exited the interstate.  The State charged the defendant with intimidation, alleging in part that he communicated a threat of an intent to harm the other driver by displaying his handgun.  Gaddis was convicted following a bench trial.  On appeal, we held these facts failed to demonstrate an intent to injure the other driver and therefore did not constitute a threat: although the "display of a firearm to another motorist while traveling in close proximity at a high rate of speed is foolish, . . . under the intimidation statute

---

[2] The defendant in *Gaddis* was charged with Class A misdemeanor intimidation alleging he communicated a threat of intent to harm the other driver with the intent that the other driver be placed in fear of retaliation for the prior lawful act of occupying a high speed lane of traffic on the interstate. *Id.* at 861.

the mere display of a handgun does not express an intention to unlawfully injure a person or his property." *Id.* at 862.

[15] In *Johnson v. State*, 743 N.E.2d 755 (Ind. 2001), however, our supreme court seemed to question the result in *Gaddis*[3] and held that when "the record shows the existence of words or conduct that are reasonably likely to incite confrontation, coupled with the display of a firearm, we are hard pressed to say that such facts are insufficient to prove that a threat has been communicated within the meaning of the intimidation statute." *Id.* at 756-57. There, the defendant made multiple derogatory remarks to an out-of-uniform officer, and when the officer began to exit his vehicle to confront the defendant, the defendant lifted his jacket to display the top of a handgun as he stated, "Don't even think it." *Id.* at 756. The court affirmed the defendant's conviction of intimidation because the defendant introduced the gun into an emotionally charged environment and suggested a willingness to use it. *Id.*

[16] McBride cites *Gaddis* for the proposition that "[i]f one has a constitutional right to possess a firearm, the intimidation statute cannot criminalize lawful use of the firearm, without something more." Br. of Appellant at 15-16 (noting in *Johnson*, the defendant displayed a firearm *and* made two obscene remarks and a threatening statement). However, McBride did not simply display a firearm

---

[3] The court noted that the State had not sought transfer in *Gaddis* and therefore, although it agreed with the general proposition that the mere display of a handgun does not express intention to unlawfully injure a person or his property, it had not had the opportunity "to evaluate whether the facts in [*Gaddis*] demonstrated that the defendant went beyond the 'mere display' of a handgun." *Id.* at 756.

as in *Gaddis*, nor did he simply legally discharge a firearm on a given day. In the weeks leading up to this incident, McBride had spray painted an insult on the cross in such a manner that it was directly facing the church, threatened to bring guns to Church, and accused Church members of killing his dogs and lying. In the context of these escalating tensions between McBride and members of the Church, on February 28, McBride displayed a decapitated dog in clear and full view of the Church parking lot and discharged multiple rounds of ammunition into the ground along the property line with no discernible target from the time members of the Church began arriving for their Sunday service until police arrived some considerable time later. Several Church members expressed their belief they might be shot going into the Church, and many stated that the constant barrage of gunfire frightened them. McBride detonated explosions near enough to the Church building to cause it to shake. It is difficult to perceive McBride's actions as anything other than a threat to cause the Church members or their building harm. Moreover, McBride's actions altered the course of services that day, likely caused the regular attendance at the Church to go down, and changed the congregants' relationship to the Church building itself and to visitors.

[17] As stated above, whether the defendant communicated a threat and intended that the victim engage in conduct against his or her will are questions for the fact finder to decide. *Owens*, 659 N.E.2d at 474. Multiple members of the Church testified that McBride's actions that day caused them to fear they would be injured simply by attending their regular church services. Such fear was

likely to be instilled in a reasonable person in that situation, *see Brewington*, 7 N.E.3d at 964, and therefore the evidence was sufficient to support the trial court's finding that McBride was guilty of intimidation.

### 2. Threat in Retaliation for Prior Lawful Act

[18] The trial court also found McBride guilty on Count I, which alleged McBride committed the offense of intimidation by communicating a threat by brandishing or discharging a firearm to those members of the Church who signed the no trespass letter with the intent that they be placed in fear of retaliation for their prior lawful act of sending the letter. *See* Ind. Code § 35-45-2-1(a)(2). Although the trial court did not enter judgment of conviction on this count, we briefly address McBride's argument about the sufficiency of the evidence supporting it, noting that we have already decided above that the evidence supports the trial court's determination that McBride's actions communicated a threat.

[19] McBride contends his case is similar to *Ransley v. State*, 850 N.E.2d 443, 448 (Ind. Ct. App. 2006), *trans. denied*, in which this court reversed a conviction for intimidation where the defendant was in a longstanding property line dispute with a neighbor and displayed a firearm during an argument with the neighbor. He seeks a similar result here. In *Ransley*, the State charged the defendant with intimidation for communicating a threat to shoot his neighbor "with the intent that [the neighbor] would not come onto [the defendant's] property and/or that [the neighbor] would be placed in fear for the prior lawful acts including arguing with [the defendant]." *Id.* at 446-47. The defendant stayed on his own

property while the two yelled at each other and although he possessed a handgun, he did not point it at the neighbor. In reversing, the court noted that the evidence was insufficient to support the defendant's conviction based on keeping the neighbor off the defendant's property because the alleged threat was intended to prevent future action rather than repay the neighbor for a prior act and because the neighbor entering the defendant's property without permission would constitute an unlawful rather than lawful act. *Id*. at 447. The State was therefore left with proving that the defendant communicated a threat intending the neighbor be placed in fear for the prior lawful act of arguing. But even though the neighbor "was given the chance to testify that [the defendant] had threatened to kill or harm him for the prior lawful act of arguing, he made no such allegation." *Id.* Thus, there was no evidence linking the defendant's threat to the act of arguing. *Id.*

[20] Here, the alleged prior lawful act was the sending of the no trespass letter. On February 21, the Church sent McBride a letter telling him he and his family were no longer welcome on Church property, and one week later, on the first Sunday after receiving the letter, McBride walked along the property line between his property and the Church's, discharging his firearm repeatedly. It was within the Church's rights to send the no trespass letter and the evidence was sufficient to show that McBride communicated a threat intending for

Church members to be placed in fear of retaliation for their prior lawful act of issuing the no trespass letter.[4]

# II. State's Cross-Appeal

[21] The State's cross-appeal alleges this case should be remanded to the trial court to impose as a condition of probation that McBride is prohibited from possessing a firearm pursuant to 18 U.S.C. section 922(g). Specifically, the State takes issue with the language in McBride's conditions of probation that he could be granted permission to have a firearm. The State argues neither the trial court nor the probation department would have authority to grant such permission, as a federal statute prohibits a convicted felon from possessing or receiving a firearm "in or affecting commerce." 18 U.S.C. § 922(g)(1). McBride responds that the State's argument is not ripe because there is no claim that McBride has even requested, let alone been granted, permission to possess a firearm.[5]

---

[4] McBride was also found guilty of two counts of disorderly conduct. He claims on appeal that, as applied to him, the disorderly conduct statute violates the Second Amendment to the United States Constitution and Article 1, section 32 of the Indiana Constitution by impermissibly regulating his right to bear arms. His argument, however, is contingent on the outcome of the first issue, as he argues that *if* his intimidation conviction is reversed, the case should not be remanded for entry of judgment on the disorderly conduct counts because it would be unconstitutional to convict him of disorderly conduct under these circumstances. Because we have held above that his intimidation conviction was supported by sufficient evidence, we need not address this issue as there are no constitutional implications. We do note, however, that although a person has the right to own guns, he has no right to misuse them or to threaten other people with them.

[5] Subsequent to this case being fully briefed, McBride submitted a notice to the court that his probation had been revoked and his probationary period unsuccessfully terminated. He therefore argues the State's cross-appeal is moot and moves that it be dismissed. He also notes, however, that he is appealing the revocation of his probation, and therefore, the cross-appeal is not yet moot, as if he is successful on appeal, he may be restored to probation.

[22] In sentencing McBride to a term of probation, the trial court imposed certain conditions of probation, including that McBride could not purchase, possess, or use any firearm "unless granted written permission by the Court or [his] Probation Officer." Appellant's App., Vol. 3 at 222. Contemporaneously, the trial court issued a No Contact Order While On Probation imposing, "in addition to all other conditions previously specified[,]" a condition prohibiting McBride from having contact with the Church or its member and stating that he "is ordered to have no firearms, deadly weapons, or ammunition in [his] possession." *Id.* at 226. The no contact order also references 18 U.S.C. section 922(g). It appears, therefore, that the trial court is aware of the restrictions on convicted felons contained in federal law. Nonetheless, there is an obvious conflict in the trial court's orders. Further, with respect to McBride's ripeness argument, the terms of probation may be modified at any time regardless of whether a probation violation has occurred. Ind. Code § 35-38-2-1.8; *see also Collins v. State*, 911 N.E.2d 700, 708 (Ind. Ct. App. 2009), *trans. denied*. We therefore remand this case for the trial court to modify the terms of McBride's probation to remove the conditional language and unequivocally state that he is not permitted to have a firearm during his probation.

# Conclusion

[23] The State presented sufficient evidence from which the trial court, as the trier of fact in McBride's bench trial, could conclude that McBride was guilty beyond a reasonable doubt of intimidation. We therefore affirm McBride's conviction.

However, because the trial court imposed a term of probation that both conflicts with another term and with federal law, we remand to the trial court to modify the terms of probation consistent with this opinion.

[24] Affirmed in part and remanded in part.

Baker, J., and Najam, J., concur.