**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**DAVID M. PAYNE**
Ryan & Payne
Marion, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**J.T. WHITEHEAD**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JOSEPH JESSE CLARK SMITH, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 27A05-1108-CR-415 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE GRANT SUPERIOR COURT
The Honorable Dana J. Kenworthy, Judge
Cause No. 27D02-1104-FB-89

**May 21, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

Joseph Jesse Clark Smith appeals his convictions and sentences for criminal trespass as a class A misdemeanor,[1] intimidation as a class A misdemeanor,[2] and two counts of theft as class D felonies.[3] Smith raises three issues, which we revise and restate as:

> I. Whether the court abused its discretion in permitting the State to elicit certain testimony from a witness;
>
> II. Whether the evidence is sufficient to sustain Smith's convictions; and
>
> III. Whether the court abused its discretion in sentencing Smith.

We affirm.

The relevant facts follow. In April 2011, Arlyn Wilson was eighty-two years old with Alzheimer's Disease and suffered from short-term memory loss. Howard Mundt lived next door to Wilson since 1960, and Marilee Murphy lived across the street from Wilson since 1967. Wilson had an accountant who was responsible for writing checks for many of Wilson's bills. In addition, Wilson was assisted by two caregivers, Frankie Fanning and Elicia Bockover, who worked for Fanning. Fanning or Bockover went to Wilson's home two times each day to prepare food and medication for Wilson. Either Fanning or Bockover would stay with Wilson from approximately 7:00 a.m. to 10:00 a.m. and again from 4:00 p.m. to 7:00 p.m. Wilson's yard was cared for by Ron Campbell, who was responsible for cutting the grass and trimming the trees on Wilson's

---

[1] Ind. Code § 35-43-2-2 (Supp. 2009).

[2] Ind. Code § 35-45-2-1 (Supp. 2006).

[3] Ind. Code § 35-43-4-2 (Supp. 2009).

property as well as on Murphy's property. Also, Fanning would sometimes work in the yard with Wilson and pick up sticks and leaves.

On one occasion in the summer of 2010, Murphy observed Smith walking around Wilson's house and it caused her concern. Murphy walked over to Wilson's house, and she and Wilson went into the yard to speak to Smith. Murphy observed a vehicle parked in front of the house with a woman and some children in it. Smith indicated he wanted to clean up the needles under Wilson's large spruce trees. Smith did not have any tools with him at the time. Smith quoted a price of $150 to remove the needles, and Wilson stated she did not have the money to do that. Smith then offered to do the work for $100, and Wilson "still said no" and "did not want that done." Transcript at 195. Smith was "quite persistent" and stated that Wilson knew who he was and that he had done work for her before. Id. Murphy asked for Smith's name and repeated to Smith what Wilson had said by stating "No, she doesn't want anything done with this now" and that "she's declined and he ought to leave." Id. Smith then entered the vehicle parked in front of Wilson's house and drove away. Approximately twenty minutes later, Smith returned in a truck, and Murphy returned to Wilson's house. Wilson and Murphy "reiterated the same thing and told him again" that Wilson did not desire that any work be performed. Id. at 197. Smith then entered the truck and drove away.

On another occasion during the summer of 2010, Wilson's caregiver Fanning arrived at Wilson's house in the afternoon and observed Smith, Smith's wife Christa, and a toddler in the backyard. Id. at 94. Fanning asked Wilson what Smith was doing and Wilson said she didn't know. Smith told Fanning that "they were cleaning up something

3

in the backyard" and that "they had been hired to do a job and they were trying to complete it." Id. However, Fanning "didn't see any evidence of that" and noticed that "they weren't doing anything but letting their toddler crawl all over the table on the back patio." Id. Fanning then asked Smith to leave.

On April 18, 2011, Smith visited Wilson's house at about 1:00 p.m. Smith knocked on the front door, and Wilson let him inside. Wilson wrote a check payable to Smith in the amount of $140, and Smith cashed the check.

The following day, on April 19, 2011, caregiver Bockover arrived at Wilson's house at approximately 4:00 p.m. The interior front door to Wilson's house was open, and the exterior glass storm door was closed. At some point a man named Floyd drove Smith to Wilson's house and waited in his vehicle for Smith. At approximately 5:30 p.m., while Wilson was seated at the dinner table eating, Smith knocked on the front door of the house, and Bockover answered the door.

Bockover opened the exterior storm door "[m]aybe six, 12 inches," which was not "enough for an individual to slide in," to speak to Smith and asked if she could help him. Id. at 141. Smith asked if Bockover's grandmother was home, and Bockover replied that Wilson was not her grandmother but that she was home. Bockover "turned to [Wilson] from the door," let the door "go shut," and "went to tell [Wilson] that there was somebody at the door and when [she] turned back around to tell [Smith] that [Wilson] would be right there, he was walking past [her]." Id. at 141-142.

Bockover stated to Smith: "Well, wait. Hold on. She'll come to the door." Id. at 142. Smith stated "Well, she knows who I am. . . . I worked here for years and done tree

4

work." Id. Bockover responded and stated "that's fine. She'll come to the door. . . . [S]he's eating dinner and she'll just come to the door and speak to you." Id. Smith then stated that he needed "his pay for the tree service." Id. Bockover had not previously seen Smith, knew that Ron Campbell usually cared for Wilson's yard, and called Fanning. After Bockover told Fanning about Smith's visit, Fanning said "No, [Wilson] pays Ron Campbell and that's the only person that was supposed to [be] doing yard work and anybody else should come with an appointment." Id. at 144. Smith stated that he "had a lot of brush from the trees that he had trimmed and he had done yard work," that "he had to pay to get rid of" the tree brush, and that "[t]hat's why he needed his money that day to pay his crew." Id. at 145. Smith stated that he had completed the work "the day before and earlier that day." Id. Bockover had walked around the yard earlier in the day and did not notice anyone working, any work that had been done, or any "fresh cuts" in the yard. Id. at 147.

Bockover told Smith to wait at the door and that Fanning "does [Wilson's] finances so in order for [Smith] to get a check, [he] should come back tomorrow" when Fanning was present. Id. Smith told Bockover "no" and that he "needed his money now so he could pay his crew." Id. at 148-149. Bockover told Smith that he "really need[ed] to come back when you don't smell like alcohol and you're sober," and Smith said, "You don't smell alcohol, you smell my cologne." Id. at 149. Smith's "face was turning red," and Bockover believed he was becoming angry. Id.

During this time Wilson was standing back and looked "intimidated and nervous." Id. at 148. She retrieved her checkbook and asked Smith "how much can I give you

5

today . . . so you can come back with an appointment tomorrow," and Smith "said something like $250" and "I'll knock $40 off of it." Id. at 151. Wilson then started to write a check. Bockover "picked up her cell phone and dialed 911 and [] didn't say anything [be]cause [she] didn't want [Smith] to know [she] was calling the cops." Id. Smith "slammed his hand down on the piano" and said "Come on, [Wilson]. She's calling the cops." Id. Smith was telling Wilson "to hurry up because his ride was leaving him." Id. at 152. Wilson finished writing a check for $150, handed it to Smith, and he returned to Floyd's vehicle and told Floyd, "[j]ust go." Id. at 104.

Shortly thereafter Marion Police Captain Angela Haley arrived at Wilson's house, spoke with Bockover, and obtained a description of Smith and of Floyd's vehicle. Marion Police Officer Kenneth Allen learned of the descriptions given by Bockover by radio, noticed Floyd's vehicle at a gas station, and followed the vehicle as it left the station. Smith told Floyd to "[g]o, go, go" and tried to grab the steering wheel. Id. at 107. Floyd told Smith to get out of his vehicle and pulled to the side of the road. Smith exited the vehicle and began to walk down the sidewalk and Floyd drove away. Officer Allen pulled up next to Smith and engaged him in conversation. Smith was initially evasive and gave Officer Allen a different name, but later admitted his identity. Officer Allen asked Smith about the check from Wilson, and Smith gave him the check. Captain Haley obtained a statement from Bockover and photographed the yard of Wilson's house.

On April 21, 2011, the State charged Smith with: Count I, burglary as a class B felony; Count II, intimidation as a class A misdemeanor; Count III, theft of $150 on April 19, 2011, as a class D felony; and Count IV, theft of $140 on April 18, 2011, as a class D

6

felony. At Smith's trial, a jury heard the testimony of, among others, Dr. Dawn Lagerkvist, a family physician who had been treating Wilson since October 2010, Wilson's accountant, Fanning, Floyd, Officer Allen, Bockover, Mundt, Murphy, Captain Haley, Christa, and Smith.

Dr. Dawn Lagerkvist testified that Wilson "is very agreeable" and that "[w]hen she's been in the office, if I ask her a question that she doesn't recall, she'll turn to who is with her which is very common for Alzheimer's patients if they don't recall." Id. at 69-70. Dr. Lagerkvist also indicated that Wilson's short term memory loss was significant, that the memory loss causes confusion for Wilson regarding her surroundings and regarding events in her life, that it would be difficult for Wilson to adapt to new surroundings, and that it would be very confusing for Wilson to come into a courtroom.[4] Dr. Lagerkvist testified that Wilson is "more agreeable and she is more ready to placate someone" and that "[e]ven when I ask nonthreatening questions in the office, that's how she responds to stressful situations. She just becomes more agreeable." Id. at 72-73. Dr. Lagerkvist indicated that Wilson would have a tendency to agree to someone's demands or assertions that she owes them something.

Floyd testified that Smith's mother lived next door to him and that Smith asked for a ride because "a lady owed him money for tree work." Id. at 100. Floyd testified that, when he dropped Smith off at Wilson's house, he was "calm, collected, normal," and that when Smith returned to the vehicle he said "Just go." Id. at 101, 104.

---

[4] Wilson did not testify at trial.

During his testimony, Mundt indicated that he lived "right next door" to Wilson, that Smith "did tree work for [him] some years ago," and that he never observed Smith do any work for Wilson. Id. at 176. Mundt, Murphy, Fanning, and Bockover each testified that Ron Campbell was the person who did Wilson's yard work.

During her testimony, Murphy indicated that on the day Smith visited Wilson's house in the summer of 2010 and Murphy told Smith that Wilson did not desire for him to do any work, she was direct with Smith, was clear and factual, and was "very definite in [her] tone of voice." Id. at 198.

Also at trial, after obtaining the court's permission, the State elicited certain testimony from Christa related to a no contact order which had been issued in connection with Smith's previous arrest for a battery against her.

Smith testified that Wilson owed him $400 and that he accepted the $140 check from Wilson on April 18, 2011 as partial payment. He testified that he was "contracting for topping [a] maple tree and spraying the bug spray," saying that he obtained bug spray and sprayed around the house and all of the trees and bushes on April 18, 2011. Id. at 387. His testimony was that after Bockover answered the door on April 19, 2011, Wilson also came to the door, that Bockover left the door, that he spoke with Wilson at the front door, that he asked Wilson if he could step inside, and that Wilson said yes.

The jury found Smith guilty of criminal trespass as a class A misdemeanor as a lesser included offense of burglary under Count I; intimidation as a class A misdemeanor under Count II; theft as a class D felony under Count III; and theft as a class D felony under Count IV. The court sentenced Smith to one year for each of his convictions under

8

Counts I and II and three years for each of his convictions under Counts III and IV, with Counts I, II, and III to be served concurrently with each other and Count IV to be served consecutive to the sentences under Counts I, II, and III.

I.

The first issue is whether the trial court abused its discretion in permitting the State to elicit certain testimony from Christa. Outside the presence of the jury, the State questioned Christa regarding a no contact order issued against Smith in March or April of 2011 which stemmed from Smith's arrest for domestic battery against Christa in March 2011. Christa indicated that there was a no contact order in place prohibiting Smith from being around her on April 18, 2011. The State asked Christa whether she told the police in March 2011 that she was fearful of Smith, and Christa responded affirmatively. The State asked the court for permission to question her on the issue of her fear of Smith given the recent report regarding the battery. Smith's defense counsel argued that the testimony the State desired to elicit would have no probative value and would be prejudicial.

The court later stated that it researched the issue of whether the State should be allowed to question Christa regarding reports she made to the police and events surrounding the report. The court found that the evidence was "not being offered to prove [Smith's] character nor to show action in conformity with that character" but rather "to show [Christa's] bias or motive to lie which is appropriate under Rule 616." Transcript at 291. The court noted that Christa was the "only witness who has testified that she observed [] Smith performing work at [] Wilson's home, so clearly any bias,

9

prejudice, or motive to lie she may have are highly relevant in this case" and that "[t]he events [] about which the State wishes to cross-examine [Christa] are recent and close in time to the events in this case . . . ." Id. The court further found that "[t]he evidence offered by the State bears heavily on [Christa's] motive to lie for her husband" and "that the probative value of this testimony under Rule 403 is not substantially outweighed by the danger of unfair prejudice to [Smith] and the State may cross-examine [] Smith on these issues." Id. at 292. The court stated that it had drafted a limiting instruction and that it would give the instruction to the jury if the defense so desired. The court then read its proposed instruction:

> Evidence has been introduced that the defendant was involved in wrongful conduct other than the offenses charged in this case. This evidence has been received solely on the issue of [Christa's] credibility. This evidence should be considered by you only for that limited purpose.

Id. Smith's counsel indicated that it desired for the court to give the instruction to the jury.

During its cross-examination of Christa before the jury, the State asked Christa if there was a no contact order in place on April 18, 2011, and whether Smith was prohibited from being in her presence or communicating with her, and Christa responded affirmatively. The State then asked "[a]nd that's because he had battered you in March," and Christa stated "Yeah." Id. at 318-319. Christa indicated that she had reported the battery to police in March. The State asked Christa whether she reported to the police that she was "afraid of [her] husband," and Christa stated "I ---- possibly, I don't know if I said I was afraid of him" and "I don't remember saying I was afraid of him. I don't know. I may have." Id. at 319. The State asked whether she told the police in March

10

"that he had threatened to kill you" and "that he was a controlling person," and Christa testified that she did not "remember saying that." Id. The State then asked if it was "in fact [] the case" that she was afraid of Smith either at the time she made the report to police or at trial, and Christa stated "No." Id. at 320. During re-direct examination, Christa indicated that she received calls from Smith from jail and that Smith did not ask her to lie for him. The court gave its proposed instruction to the jury.

Smith argues that the trial court erred by allowing the State to present evidence that Christa was testifying out of fear. Smith argues that "[t]here is very little evidence of probative value to show that Christa is testifying out of fear," that "[o]n the contrary, there is enormous prejudicial value in presenting evidence to show that [Smith] is a wife beater," that "[t]he defense never voir dired jurors on domestic abuse," that "[t]he allegations were not even substantiated," and that the questions the prosecutor asked "poison[ed] the well." Appellant's Brief at 13; Appellant's Reply Brief at 4. Smith further argues that "[w]hen considering the probative value of her testimony, one would have to ask what exactly was it [Christa] lied about" and that "[s]he did not provide [Smith] with a slam dunk alibi." Id. at 17. The State argues that the court properly admitted evidence of Christa's potential bias and motive to lie, namely, her fear of reprisal by Smith, and that the jury instruction rendered any error harmless.

The admission and exclusion of evidence falls within the sound discretion of the trial court, and we review the admission of evidence only for abuse of discretion. Wilson v. State, 765 N.E.2d 1265, 1272 (Ind. 2002). An abuse of discretion occurs "where the decision is clearly against the logic and effect of the facts and circumstances." Smith v.

11

*State*, 754 N.E.2d 502, 504 (Ind. 2001). "Errors in the admission or exclusion of evidence are to be disregarded as harmless error unless they affect the substantial rights of a party." *Fleener v. State*, 656 N.E.2d 1140, 1141 (Ind. 1995) (citations omitted).

Ind. Evidence Rule 607 provides that the credibility of a witness may be attacked by any party. Ind. Evidence Rule 616 specifies: "For the purpose of attacking the credibility of a witness, evidence of bias, prejudice, or interest of the witness for or against any party to the case is admissible." The Rule provides for the admission of evidence showing bias or prejudice of a witness without any qualifications. *Ingram v. State*, 715 N.E.2d 405, 407 (Ind. 1999). However, it "should be read in conjunction with Rule 403's required balancing of probative value against the danger of unfair prejudice." Id. Ind. Evidence Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Further, on appeal we presume that the jury followed the instructions tendered by the trial court. *Williams v. State*, 782 N.E.2d 1039, 1047-1048 (Ind. Ct. App. 2003), trans. denied.

Based upon our review of the record, including the trial court's instruction to the jury, we cannot say the testimony elicited from Christa by the State was not evidence of bias, prejudice, or interest under Ind. Evidence Rule 616 or that the probative value of the evidence is substantially outweighed by the danger of unfair prejudice to Smith. The court did not abuse its discretion in admitting the testimony challenged by Smith. See *Ingram*, 715 N.E.2d at 408 (holding that the trial court did not abuse its discretion in

12

finding that the probative value of challenged evidence was not substantially outweighed by the danger of unfair prejudice).

In addition, even if the challenged testimony was admitted in error, we conclude that such error does not warrant reversal. An error will be found harmless if its probable impact on the jury, in light of all of the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties. Gault v. State, 878 N.E.2d 1260, 1267-1268 (Ind. 2008). Smith does not demonstrate that the admission of the challenged portion of Christa's testimony affected his substantial rights. The evidence before the jury included the testimony from Fanning, Floyd, Officer Allen, Bockover, Mundt, Murphy, and Captain Haley, as well as photographs of Wilson's yard and the trees in the yard. This evidence supported the conclusion that Smith committed two counts of theft when on two occasions he demanded and took money from Wilson for work he never performed or intended to perform, and that he committed the trespass and intimidation offenses. Based upon our review of the record, we find that the probable impact of any erroneous admission of the challenged portion of Christa's testimony did not affect Smith's substantial rights, and any error in admitting the testimony must be disregarded as harmless.

## II.

The next issue is whether the evidence was sufficient to sustain Smith's convictions. When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. Jordan v. State, 656 N.E.2d 816, 817 (Ind. 1995), reh'g denied. Rather, we look to the evidence and the reasonable inferences

13

therefrom that support the verdict. Id. We will affirm the conviction if there exists evidence of probative value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. Id.

Smith argues that the evidence is insufficient to sustain his convictions for criminal trespass, intimidation, and two counts of theft.

A. Criminal Trespass

With respect to his conviction for criminal trespass, Smith argues that "[a]s a result of having stepped in the home, [he] was charged with burglary," that "[t]he jury found him not guilty of burglary, but did convict him on the Class A criminal trespass charge," and that "[t]here is no indication that he was asked to leave and the testimony is uncontroverted that he had been in the house the day before." Appellant's Brief at 23. Smith further argues that "[u]nder the circumstances, when [Bockover] opened the door, it was fair for [Smith] to assume that he was being invited in, based on the fact that he had been in the home the day before" and that he "had the implied consent of [Wilson] to step in the door and if [Wilson] did not want him in the home, someone should have asked [him] to leave." Id.

The State argues that "Bockover told Smith to 'wait' and 'hold on' but he did not" and that "Smith ignored her." Appellee's Brief at 17. The State argues that Bockover "even tried to close the door when she turned around to tell [Wilson] that Smith was at the door." Id. The State argues that "Smith entered the home without [Wilson's] consent, intentionally, when he had no proprietary interest in her home." Id.

14

The offense of criminal trespass is governed by Ind. Code § 35-43-2-2, which provides in part that "[a] person who . . . not having a contractual interest in the property, knowingly or intentionally enters the dwelling of another person without the person's consent . . . commits criminal trespass, a Class A misdemeanor."

The record reveals that, at approximately 5:30 p.m. on April 19, 2011, Smith knocked on the front door of Wilson's house, and Bockover answered the door. The interior front door to Wilson's house was open, and the exterior glass storm door was closed. During her testimony, Bockover indicated that, when Smith knocked on the front door of Wilson's house on April 19, 2011, she opened the exterior storm door "[m]aybe six, 12 inches," which was "[f]ar enough for [her] to [be] able to talk to [Smith] face to face" but not "enough for an individual to slide in." Transcript at 141. Bockover testified that when she turned around to Wilson after speaking with Smith at the door, the door "was shut" and that she "had let it go shut when [she] turned to [Wilson]." Id. at 142. Bockover testified that Smith nevertheless entered Wilson's house and "was walking past [her]," id. at 141, that she told Smith to "wait" and "[h]old on," that Wilson would "come to the door," id. at 142, and that she told Smith that he "really need[ed] to come back when you don't smell like alcohol and you're sober." Id. at 149. Smith did not exit Wilson's house until Wilson gave him a check and Bockover dialed 911.

A reasonable trier of fact could have concluded from the testimony presented at trial that Smith knowingly or intentionally entered Wilson's home without consent. Based upon the evidence most favorable to the conviction, we conclude that sufficient evidence exists from which the jury could find Smith guilty beyond a reasonable doubt of

criminal trespass as a class A misdemeanor. See Belcher v. State, 453 N.E.2d 214, 215-216 (Ind. 1983) (affirming a conviction for criminal trespass where witnesses testified that the defendant entered the victim's property, despite the defendant's testimony to the contrary).

B.     Intimidation

With respect to his conviction for intimidation, Smith argues that he "went to the home to receive partial payment for work he had contracted to perform," that "[i]t's unclear as to what threat he communicated," and that Bockover "did call 911" but that Wilson "had nothing to fear--the police were not being called on her." Appellant's Brief at 24. Smith also argues that he "apparently, according to [Bockover], claimed the work had been completed and that he needed the money to pay his crew," and that "[i]f he said that, it is a lie, but it is not a threat." Id. The State argues that "[w]hether a particular communication constitutes a threat is a question for the trier of fact" and that "Smith communicated his threat to [Wilson] when he slammed his hand down on her piano, visibly angered, and said 'Come on, [Wilson], she's calling the cops.'" Appellee's Brief at 17-18.

The offense of intimidation as a class A misdemeanor is governed by Ind. Code § 35-45-2-1(a), which provides in part that "[a] person who communicates a threat to another person, with the intent . . . that the other person engage in conduct against the other person's will . . . commits intimidation, a Class A misdemeanor." A "threat" means an expression, by words or action, of an intention to . . . unlawfully injure the person

16

threatened or another person, or damage property; unlawfully subject a person to physical confinement or restraint; [or] commit a crime . . . ." Ind. Code § 35-45-2-1(c).

The Indiana Supreme Court has stated that "whether a defendant intended that someone engage in conduct against his or her will depends on the facts and circumstances of each case" and that "we have adopted an objective view of whether a communication is a threat." Owens v. State, 659 N.E.2d 466, 474 (Ind. 1995), reh'g denied. The Court then concluded that "[t]herefore, both whether [the defendant] intended that the three men engage in conduct against their will and whether his communications to the three men, objectively viewed, were threats were questions of fact for the jury to decide." Id.

Based upon the evidence most favorable to the conviction and observing that we cannot reweigh the evidence or judge the credibility of witnesses, we conclude that sufficient evidence exists from which the jury could find Smith guilty beyond a reasonable doubt of intimidation as a class A misdemeanor. See Owens, 659 N.E.2d at 474-475 (holding that substantial evidence of probative value was presented on each element of each alleged instance of intimidation and finding no basis to disturb the jury's verdicts).

C.    Theft

With respect to his two convictions for theft, Smith argues that he and Wilson had reached an agreement that he would be paid $400 for his work, that "[i]t took at least an hour to do the spraying," that he "did not do any other work on" April 18, 2011, and that "[h]e asked if he could be paid part of his money and [Wilson] gave him a check for One Hundred Forty Dollars ($140.00) as partial payment." Appellant's Brief at 19. Smith

17

further argues that the evidence most favorable to the State would show that on April 19, 2011, he "demanded to be paid and indicated that he had finished the work," and that "[a]t most, it appears [he] was demanding money when in fact he hadn't finished the work." Id. at 20-21. Smith argues that he did not exert unauthorized control over the property of another person, that Wilson gave him the checks, and that "[t]he evidence shows that [Wilson] had simply paid [Smith] for work that he had not yet completed." Id. at 21.

The State argues that it proved both counts of theft, that the "amounts charged – four hundred ($400.00) dollars for an hour of bug spraying and no tree work – also supports the reasonable conclusion that Smith's sole purpose was to deprive [Wilson] of her money . . . ." Appellee's Brief at 19. The State asserts that discrepancies in Smith's testimony undermine his credibility, and that "the jury chose to believe that Smith took [Wilson's] money, period, without working for it, and that was their province." Id. at 19-20. The State argues that it "sufficiently proved that Smith took money from [Wilson] on both dates, April 18, and April 19," and that "it was money for no work, but was simply money that Smith scared out of his victim, or conned out of her, given her inability to function mentally or remember recent events." Id. at 20.

The offense of theft is governed by Ind. Code § 35-43-4-2, which provides in part that "[a] person who knowingly or intentionally exerts unauthorized control over property of another person, with intent to deprive the other person of any part of its value or use, commits theft, a Class D felony." We have observed that "[i]ntent is a mental function, and without a confession, it must be determined from a consideration of the conduct and

18

the natural consequences of the conduct giving rise to the charge that the defendant committed theft." Long v. State, 867 N.E.2d 606, 614 (Ind. Ct. App. 2007) (citations omitted), reh'g denied. "Accordingly, intent may be proven by circumstantial evidence, and it may be inferred from a defendant's conduct and the natural and usual sequence to which such conduct logically and reasonably points." Id.

Based upon the evidence most favorable to the convictions as recited previously in this opinion, we conclude that sufficient evidence exists from which the jury could reasonably conclude that Smith knowingly or intentionally exerted unauthorized control over the property of Wilson with intent to deprive her of its value and find Smith guilty beyond a reasonable doubt of two counts of theft as class D felonies. See Long, 867 N.E.2d at 614 (holding that the evidence presented was sufficient to support defendant's theft conviction where the victims made payments for items but the defendant never delivered the items and noting that intent may be inferred from a defendant's conduct and that it is not our appellate role to reweigh the evidence and assess witness credibility); see also Wallace v. State, 896 N.E.2d 1249, 1252 (Ind. Ct. App. 2008) (holding that the evidence was sufficient to sustain the defendant's conviction for theft as a class D felony), reh'g denied, trans. denied.

III.

The next issue is whether the trial court abused its discretion in sentencing Smith. We review the sentence for an abuse of discretion. Anglemyer v. State, 868 N.E.2d 482, 490 (Ind. 2007), clarified on reh'g, 875 N.E.2d 218 (Ind. 2007). A trial court abuses its discretion if it: (1) fails "to enter a sentencing statement at all;" (2) enters "a sentencing

19

statement that explains reasons for imposing a sentence—including a finding of aggravating and mitigating factors if any—but the record does not support the reasons;" (3) enters a sentencing statement that "omits reasons that are clearly supported by the record and advanced for consideration;" or (4) considers reasons that "are improper as a matter of law." Id. at 490-491. However, the relative weight or value assignable to reasons properly found, or those which should have been found, is not subject to review for abuse of discretion. Id. at 491.

Smith argues that the court erred in sentencing him to two consecutive three-year terms for theft. Smith argues that the two sentences for theft should have been merged as a single crime for sentencing purposes. Smith also asserts that theft is not a crime of violence under Ind. Code § 35-50-1-2(a), that his convictions for theft constitute a single episode of criminal conduct under Ind. Code § 35-50-1-2(b), and thus that his sentence may not exceed the advisory sentence of four years for a class C felony as set forth under Ind. Code § 35-50-1-2(c). The State argues that Smith was properly sentenced, that Smith's two thefts "do not constitute a single episode of criminal conduct," that they "are two separate thefts, or two separate acts," and that "[t]he evidence even supports the conclusion that the success of the first theft inspired an altogether different, second theft of [] Wilson." Appellee's Brief at 21.

Ind. Code § 35-50-1-2(c) provides in part:

> [E]xcept for crimes of violence, the total of the consecutive terms of imprisonment, exclusive of terms of imprisonment under IC 35-50-2-8 and IC 35-50-2-10, to which the defendant is sentenced for felony convictions arising out of an episode of criminal conduct shall not exceed the advisory sentence for a felony which is one (1) class of felony higher than the most serious of the felonies for which the person has been convicted.

Ind. Code § 35-50-1-2(b) provides: "As used in this section, 'episode of criminal conduct' means offenses or a connected series of offenses that are closely related in time, place, and circumstance." "In making this determination, emphasis has been placed on the timing of the offenses and the simultaneous and contemporaneous nature, if any, of the crimes." Gootee v. State, 942 N.E.2d 111, 114 (Ind. Ct. App. 2011) (citing Reed v. State, 856 N.E.2d 1189, 1200 (Ind. 2006)), trans. denied. "Additional guidance on whether multiple offenses constitute an episode of criminal conduct can be obtained by considering whether the conduct is so closely related in time, place, and circumstance that a complete account of one charge cannot be related without referring to details of the other charge." Id.

In this case, the trial court concluded that Smith's two theft offenses did not constitute a single episode of criminal conduct. In its order of sentence, the court stated that it based its conclusion on the following specific factors:

1. The crimes in Counts 1-3 occurred on a different date (April 19, 2011) than the crime in Count 4 (April 18, 2011).

2. The Theft in Count 3 involved a different sum of money ($150) than the Theft in count 4 ($140).

3. The Thefts in Counts 3 and 4 involved two different checks. [Smith] cashed the first check on April 18, 2011; the second check was in [Smith's] possession on April 19, 2011 at the time of his arrest.

4. The Thefts in Counts 3 and 4 involved two separate occasions on which [Smith] went to the victim's home, and two separate interactions between [Smith] and [the] victim.

5. Although [Smith] testified at trial that the two occasions were related by a contract for work that he and [the] victim had reached, the Court does not find his testimony credible. Rather, the Court finds

21

based upon the totality of the evidence that [Smith] went to the victim's home with the intention of conning her out of money with no intention of doing work for her. After his successful theft on the first date, he decided to go back and take advantage of the victim a second time.

6.     [Smith] had more than adequate time and opportunity following the first crime[] to conform his behavior to the dictates of the law prior to the Theft in Count 4, and therefore avoid consecutive sentencing. He chose not to do so.

Appellant's Appendix at 88-89.

Smith's two theft offenses did not constitute an episode of criminal conduct. Although the two thefts occurred within a period of two days and at the same location, they were nevertheless separate incidents. Each theft can be recounted without referring to the other theft. Based upon the record and evidence, we cannot say that the trial court abused its discretion in finding that Smith's two theft offenses did not constitute an episode of criminal conduct and ordering that Smith serve his sentences for his two theft convictions consecutive to each other. See Gootee, 942 N.E.2d at 114-115 (holding that the defendant's offenses did not constitute an episode of criminal conduct and that although the forgery-fraud incidents all occurred within a period of two days, and two of the incidents occurred within minutes of each other at the same location, they were all, nevertheless, separate incidents).

For the foregoing reasons, we affirm Smith's convictions and sentence.

Affirmed.

KIRSCH, J., concurs.

BAKER, J., concurs in part and dissents in part with separate opinion.

22

# IN THE
# COURT OF APPEALS OF INDIANA

JOSEPH JESSE CLARK SMITH,     )
           )
    Appellant-defendant,       )
           )
       vs.        )     No.  27A05-1108-CR-415
           )
STATE OF INDIANA,        )
           )
    Appellee-plaintiff.       )

**BAKER, Judge, concurring in part and dissenting in part.**

While I agree that Christa was properly permitted to testify at trial and that Smith's convictions for theft and criminal trespass should be affirmed, I respectfully dissent with the majority's decision to affirm Smith's conviction and sentence for intimidation.

Indiana Code section 35-45-2-1(c) defines a threat as "an expression, by words or action, of an intention to . . . unlawfully injure the person threatened or another person, or damage property; unlawfully subject a person to physical confinement or restraint; [or] commit a crime."

In this case, Wilson began writing the check and asked what the date was. Given these circumstances, Smith's subsequent act of hitting his hand on the piano, coupled

with the statement, "come on [Wilson], she's calling the cops," tr. p. 151, does not amount to a threat with the intent that Wilson engage in conduct against her will pursuant to Indiana Code 35-45-2-1(a)(2). In other words, I cannot agree that the State sufficiently proved that Smith's words or actions intimidated Wilson into giving him money for work that he did not perform.

In sum, I do not believe that the State proved that Smith committed the offense of intimidation. Thus, I vote to vacate the conviction and sentence on that offense. However, I would affirm the judgment in all other respects.